**KERNS, INC., a Michigan Corporation, Plaintiff–Appellant,**

v.

**The WELLA CORPORATION, a New York Corporation, Defendant– Appellee.**

No. 96–1221.

United States Court of Appeals, Sixth Circuit.

Argued March 13, 1997.

Decided May 22, 1997.

---

J. Michael Fordney, Tobin H. Dust, argued and briefed, Fordney, Dust & Prine, Saginaw, MI, for Plaintiff–Appellant.

Lori M. Silsbury, Dykema Gossett, Lansing, MI, R. Noel Clinard, R. Hewitt Pate, argued and briefed, Hunton & Williams, Richmond, VA, for Defendant–Appellee.

Before: BOGGS and BATCHELDER, Circuit Judges; and FORESTER, District Judge.*

## OPINION

BOGGS, Circuit Judge.

Kerns, Inc., a wholesale distributor of beauty products, and The Wella Corporation, a manufacturer of such products, entered into a contract on November 24, 1984, which

* The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

awarded Kerns the right to distribute Wella's "International Line" of products within the state of Michigan. The agreement provided that either party could terminate the contract on sixty days' notice without cause, and that Wella could terminate the contract immediately upon, *inter alia*, "any substantial change in the ... financial status [or] sales volume ... of Distributor." Wella terminated the contract on July 14, 1994, citing substantial changes in both the financial status and sales volume of Kerns.[1] Kerns brought this action in the United States District Court for the Eastern District of Michigan, asserting claims of breach of contract and tortious interference with business relations against Wella. The district court dismissed the tortious interference claim and awarded summary judgment to Wella on the breach of contract claim, and this appeal followed. For the reasons discussed below, we affirm.

## I

Under the terms of the distribution agreement, Kerns was entitled to a discount if it made its payments within a time period established by Wella. For most of the life of the agreement, that period was thirty days after the products were shipped to Kerns. Kerns would often claim unearned discounts; that is, it would fail to pay within the required thirty days, but still would claim discounts available under the contract only for timely payments. An employee of Wella, Virginia Galasso, testified that she often placed Kerns on "credit hold," thereby refusing to send any further supplies to Kerns without advance payment. Galasso characterized Kerns as a "credit manager's nightmare," in part because representatives of Kerns often would play "corner office bingo" by going over her head to ask her superiors to excuse their late payments. Mario Argenti, the president of Wella, attested that, from 1992 to July 1994, Kerns had abused its trade credit terms with Wella and that during that time no other distributor's credit problems approached those of Kerns. He

1. Kerns retains the right to distribute Wella's "Classic Line" of beauty products.

further attested that it did not become clear to him until 1994 that these problems were caused by Kerns's "deteriorating financial status."

Representatives of Kerns and of Wella met at an industry convention in August 1993 to discuss the terms of repayment of Kerns's debt to Wella. Wella agreed to extend its standard thirty-day repayment period to forty-five days for a period of six months, but warned Kerns that it would not tolerate any additional attempts to claim unearned discounts, and that Kerns would be required to keep its account current. However, Kerns continued to have difficulty making its payments on time, and Wella continued to place Kerns on credit hold periodically.

In January 1994, Argenti met with Robert Morford, the president of Kerns, to discuss Kerns's financial situation. Morford promised to provide Wella with Kerns's financial records, but never did so. During the same month, Clairol, a competitor of Wella, gave Kerns notice that it was substantially reducing the territory in which Kerns would be authorized to distribute Clairol's Logics line of beauty products. Shortly thereafter, Meijer's—which was Kerns's largest chain salon customer—announced its plans to close its salon business. John Vasone, a sales manager for Wella, attested that he was concerned about the effect that these two events would have on Kerns's ability to maintain its financial status. Representatives of Kerns confirmed this fear in March 1994 when they informed Vasone that it was "in a severe cash flow situation" and was "unable to pay its invoices on time."

On April 20, 1994, Morford wrote to Heinz Schultner, Wella's Vice-President of Finance, requesting permission to place a $97,000 order on credit, despite the fact that Wella had placed Kerns on credit hold through March and April. The letter stated that the order was needed to "help build our depleted inventory levels and [to] ensure short term availability of Wella products in our marketplace." Schultner responded that Wella could not accept that proposal until Kerns repaid its outstanding $150,000 debt to Wella,

but that if the debt was repaid Wella would accept a ninety-day repayment period for the $97,000 order. In May 1994, Morford responded by requesting that Wella increase Kerns's credit line to $250,000 and pay the salary of Kerns's sales manager as part of a "24-month Business Growth Plan." Schultner rejected that proposal on June 10, 1994. His letter noted that

> [y]our proposal seems to indicate that the lack of financial resources is the main reason for not being able to move faster. If this is the case, then we cannot help you since you are operating independently and have to ensure that you have sufficient funds to support Wella in a partnership.

In May 1994, Dun & Bradstreet submitted a report to Wella of Kerns's financial status. The report summarized Kerns's financial status as of 1992 as "fair," and recommended that Kerns's credit line should be limited to $10,000.[2] The report noted that Kerns's ratio of accounts payable to capitalization was 24.3%, as opposed to the industry average of 18.1%, and that its ratio of long term debt to capitalization was 26.2%, as opposed to the industry average of 12.6%.

The report analyzed Kerns's payment history through May 1994, and determined that Kerns had a "limited availability of funds," and an "unfavorable ability to make payments in a timely manner." As of May 1994, Kerns's score on Dun & Bradstreet's PAY-DEX scale, which measures timeliness of payments, was 54 out of 100, or an average of twenty-seven days late. Kerns's score had been 60 during the previous twelve months, and 63 during the twelve months before that. The median score for the industry during that period had remained stable at 76 out of 100, or an average of six days late; the bottom quartile of the industry also remained stable at approximately 66 out of 100, or an average of approximately eighteen days late.

In late May 1994, one Wella sales manager, M.J. Dobrenski, was the recipient of several requests from Kerns employees for jobs; those employees stressed their concern that Kerns would soon go out of business, and

---

2. Because Kerns did not make its financial records public or submit its records to Wella, Dun & Bradstreet relied on a 1992 submission from Kerns to the Michigan Chamber of Commerce.

reported that Kerns had sent its entire warehouse staff home early three times that month for lack of work. In June 1994, Wella reiterated its request that Kerns provide Wella with its financial records. Kerns declined to honor that request in a July 7, 1994, letter. Seven days later, Wella gave notice to Kerns that it would terminate the contract the next day. The letter cited the following reasons:

> (1) a substantial change in the sales volume of Kerns, *i.e.,* its failure to maintain adequate sales levels, and (2) a substantial change in the financial status of Kerns, *i.e.,* its insolvency in the sense of not being able to pay Wella's bills for an adequate supply of product as they become due in the ordinary course of business.

In discovery in this action, Wella obtained Kerns's financial records. They reveal that Kerns had enjoyed a profit of $8,000 in the fiscal year ending June 30, 1993, but had suffered a loss of $22,000 in fiscal year 1994; that Kerns's sales volume had declined by over $1 million from fiscal year 1993 to fiscal year 1994; and that the discontinued Meijer's account had been the source of $375,000 of Kerns's sales and $90,000 of its profit in fiscal year 1994. William Wallace, a certified public accountant, analyzed those records and attested that he believed that the termination of the Meijer's account was a "significant adverse event." Kerns had paid substantial penalties to the United States government in 1993 and 1994 for failure to pay payroll taxes, had suffered from frequent cash overdrafts, and had "frequently" signed and dated checks several days before those checks were mailed; Wallace attested that these facts indicated to him that Kerns had developed a severe cash flow problem. Wallace further attested that an "already high trend" in increases in the ratio of Kerns's bank and trade debt to its capitalization had "worsened," and that the amount of working capital available to Kerns had "significantly declined" from 1993 to 1994. On the basis of each of these factors, Wallace believed that, as a general matter in the industry, a distributor would terminate a distribution arrangement if presented with failures to make payments similar to those of Kerns.

## II

Kerns argues on appeal that summary judgment was improper on its breach of contract claim because there is a genuine issue of material fact as to whether there had been a substantial change in its financial status or its sales volume. In particular, Kerns argues that Wella relied upon, and the district court accepted, an inaccurate definition of "substantial" in interpreting the termination clause of the contract. We analyze this claim under New York law; the contract provides that it "shall be construed in accordance with the laws of the state of New York," and the parties agree that the forum state, Michigan, would accept such a contractual choice of law provision. *See Chrysler Corp. v. Skyline Indus. Servs.,* 448 Mich. 113, 528 N.W.2d 698, 703 (1995), *citing* Restatement (Second) of Conflict of Laws § 187.

Not surprisingly, New York follows the rule that a contract should be read according to its plain meaning, and that any ambiguities should be resolved with a view toward approximating the intent of the parties. *See Siebel v. McGrady,* 170 A.D.2d 906, 566 N.Y.S.2d 736, 738 (1991). New York courts often refer to dictionaries, and specifically to *Webster's Third New International Dictionary,* to determine the definition that the parties intended for an ambiguous term. *See Brennan v. Murphy & Walsh Assocs.,* —— A.D.2d ——, 650 N.Y.S.2d 464, 465 (1996); *Zuckerman v. Empire Blue Cross & Blue Shield,* 155 Misc.2d 271, 598 N.Y.S.2d 665, 666 (N.Y.Sup.1993). We shall do the same. We believe that the definition of "substantial" that the parties most likely intended is "considerable in amount, value, or worth." *Webster's Third New International Dictionary* 2280 (1986). While Wella refers us to an alternative definition in the same dictionary—"not seeming or imaginary; not illusive; REAL, TRUE," *id.*—we do not believe that the parties intended that Wella could terminate the contract upon any minimal change in Kerns's financial status or sales volume. Of course, there is still room for some disagreement as to whether a change is "considerable in amount, value, or worth";

therefore, we shall attempt to apply this definition in light of prevailing industry practices, as the New York courts do in similar cases. *See Merritt Assocs. v. Scollard,* 161 A.D.2d 502, 555 N.Y.S.2d 771, 773 (1990).

■ Before proceeding to decide whether Kerns had suffered a change in its financial status or sales volume that was "considerable in amount, value, or worth," we must first determine the evidence of Kerns's finances to which we may refer in making that determination. Kerns argues that Wella may only rely on such information as was available to it at the time that it made the decision to terminate the contract. We disagree. With respect to statutory causes of action that prohibit employment discrimination, the New York courts follow the federal rule that an employer may not refer to evidence acquired after its decision to discharge an employee, since such evidence is not relevant to the central question of the employer's motive for that discharge. *Compare McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 358–60, 115 S.Ct. 879, 885, 130 L.Ed.2d 852 (1995), *with McCarthy v. Pall Corp.,* 214 A.D.2d 705, 625 N.Y.S.2d 296, 296–97 (1995). However, with respect to contractual causes of action, New York follows the rule that, if a party has a contractual right to take an action, the court may not inquire into that party's motive for exercising that right. *See Fry v. McCall,* 945 F.Supp. 655, 667 (S.D.N.Y.1996); *Big Apple Car, Inc. v. City of New York,* 204 A.D.2d 109, 611 N.Y.S.2d 533, 534 (1994); *State Bank of Chittenango v. Central Nat'l Bank, Canajoharie,* 202 A.D.2d 828, 609 N.Y.S.2d 381, 383 (1994). Accordingly, although there is a dearth of authority on this issue, we believe that the *McKennon* reasoning is inapplicable in cases similar to this one, and that the New York courts would not bar the use of after-acquired evidence in a contract action; a party may terminate a contract for cause, and gamble that its estimate of the situation will be justified when all the facts are proven. *Cf. Vichare v. AMBAC*

*Inc.,* 106 F.3d 457, 467 (2d Cir.1996) (upholding district court's refusal to bifurcate trial, thus allowing after-acquired evidence in breach of fiduciary duty counter-claim to be heard in liability phase of Title VII claim). We also believe that it is particularly appropriate to apply that rule in this case, as Kerns's recalcitrance was the sole reason that Wella was forced to wait until discovery in this action to develop the full facts that vindicate its decision to terminate the contract.[3]

■ Thus, Wella may rely on the full range of evidence in the record, and that evidence demonstrates that Kerns has suffered a substantial change in its financial status. The Dun & Bradstreet report establishes that Kerns's PAYDEX score for timeliness of payments fell from 63 to 54, a decline that we understand to represent an increased delay of payment by over a week. We believe that the beauty products industry would consider this change to be substantial; our belief is borne out by a graph in the Dun & Bradstreet report, which establishes that, while Kerns's PAYDEX score had historically been only slightly below the bottom quartile in the industry, its 1994 score is further from the bottom quartile than the bottom quartile is from the top quartile. Kerns argues that the PAYDEX score is inaccurate, as it is skewed by its poor performance with regard to its largest creditor. Unfortunately for Kerns's position, its largest creditor is Wella; if the score is inaccurate, any error is in Kerns's favor.

Kerns's financial records also demonstrate that it had suffered a substantial change in its financial status. Its profit status fell from a gain of $8,000 in fiscal year 1993 to a loss of $20,000 in fiscal year 1994. Kerns argues that this decline is minor in comparison to its overall sales volume. However, these figures do not yet fully reflect the loss of the Meijer's account and of the right to distribute Clairol products. Since Meijer's provided

---

**3.** This disposition renders it unnecessary for us to consider Kerns's contention that Wella actually decided to terminate the contract in April 1994. However, we note the seeming implausibility of the contention that Wella would wait over three months to terminate a contract for cause, when it had the right to terminate unconditionally upon 60 days' notice. Kerns argues,

without supporting evidence, that Wella did so because it intended to destroy Kerns. This argument is both irrelevant to the merits of the breach of contract action and, again, seemingly implausible, given that Wella allows Kerns to continue to carry its Classic Line of beauty products.

Kerns with a $90,000 profit in fiscal year 1994, and Kerns has provided this court with no argument that it was able to replace that account, we infer that in 1994 Kerns faced the prospect of losses far higher than any losses it had suffered in previous years. Furthermore, Kerns's ratios of accounts payable and long term debt to capitalization, which were already troubling in 1992, as summarized in the Dun & Bradstreet report, increased significantly in 1993 and 1994. We believe that these facts establish that Kerns had suffered a considerable, or substantial, change in its financial status; any doubt on this score is dispelled by the uncontradicted analysis of industry norms by the accountant William Wallace, who averred that these changes were sufficient cause within the beauty products industry to justify the termination of a distribution contract. *Cf. Merritt Assocs.*, 555 N.Y.S.2d at 773.[4] Therefore, Wella was not in breach when it terminated its contract with Kerns.[5]

### III

The judgment of the district court is AFFIRMED.

---

4. Because the termination clause in the contract was written in the disjunctive, the substantial change in Kerns's financial status alone justifies the termination, and we need not consider Wella's contention that Kerns had also suffered a substantial change in its sales volume.

5. We do not address Kerns's claim for tortious interference with business relations, because its notice of appeal specified only the award of summary judgment on the contract claim, and because Kerns did not argue the tort claim on appeal.