*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0283P (6th Cir.)
File Name: 01a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CITY OF WYANDOTTE, a
Michigan municipal
corporation,
      *Plaintiff-Appellee,*

      *v.*

CONSOLIDATED RAIL
CORPORATION, also known as
Conrail, also known as
Conrail, Inc., a Pennsylvania
corporation,
      *Defendant-Appellant.*

No. 00-1151

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-71237—John Corbett O'Meara, District Judge.

Argued: May 1, 2001

Decided and Filed: August 24, 2001

Before: JONES, COLE, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Joseph J. McDonnell, DURKIN, McDONNELL, CLIFTON, DAVIS & O'DONNELL, Detroit, Michigan, for Appellant.   William R. Look, LOOK, MAKOWSKI & LOOK, Wyandotte, Michigan, for Appellee.  **ON BRIEF:** Joseph J. McDonnell, Gregory A. Clifton, DURKIN, McDONNELL, CLIFTON, DAVIS & O'DONNELL, Detroit, Michigan, for Appellant.    William R. Look, LOOK, MAKOWSKI & LOOK, Wyandotte, Michigan, for Appellee.

_____

**OPINION**

_____

R. GUY COLE, JR., Circuit Judge.  In this diversity action, Defendant-Appellant Consolidated Rail Corporation ("Conrail") appeals from the district court's grant of summary judgment in favor of Plaintiff-Appellee City of Wyandotte ("the City").  The underlying action stems from a dispute concerning whether Conrail is obligated to undertake certain cosmetic improvements of two bridges pursuant to a grade separation agreement ("the Agreement").  The district court found that the terms of the Agreement unambiguously require Conrail to perform the disputed improvements and, accordingly, granted the City's motion for summary judgment on this point, from which Conrail now appeals.  Also a subject of this appeal is the district court's denial of Conrail's motion for summary judgment urging dismissal of the City's complaint for its alleged failure to raise claims within the applicable six-year statute-of-limitations period and, alternatively, for its alleged undue delay (and attendant prejudice suffered by Conrail) in raising its claims. Because we are persuaded that the contract terms at issue in this case are susceptible to multiple interpretations, we hold that the district court erred in granting the City's motion for summary judgment, and we accordingly **REVERSE** its decision.  We

do not believe, however, that the City's claims are barred by either Michigan's statute of limitations or by the equitable doctrine of laches, and we **AFFIRM** the district court's denial of Conrail's motion for summary judgment on this ground.

## I. BACKGROUND

On April 22, 1927, the City entered into a grade separation agreement with four railroads, all of which agreed to construct and maintain five bridges over Eureka Road in Wyandotte, Michigan. One of the railroads was to construct and maintain two of the bridges and the other railroads each were to construct and maintain one bridge. The purpose of the bridges was to allow railroad tracks to span Eureka Road and to avoid the construction of a multiple-track grade crossing. Conrail, as a successor to the Agreement, now maintains tracks over two of the bridges and has assumed all rights and obligations provided for by the Agreement as to those two bridges. Pursuant to the Agreement, Conrail is required "to maintain, repair and renew at its own expense, all parts of its bridge structures, track structures, retaining walls, piers, abutments and wingwells, within the lines of its right-of-way . . . ." The Agreement does not, however, expressly require Conrail to undertake any cosmetic improvements of the bridges, and Conrail in fact has never made any such improvements.

Sometime in 1993, the City requested Conrail's participation in the "Eureka Avenue Corridor Landscaping and Beautification Project," an initiative that would have required Conrail to perform certain cosmetic improvements of the bridges, which the City characterized in written correspondence to Conrail as being in a "very decayed condition." Although the other parties to the Agreement participated in the project to the satisfaction of the City, Conrail declined, concluding that the express terms of the Agreement mandated only that the bridges be maintained for structural soundness and imposed no requirement that Conrail preserve or enhance the appearance of the bridges. Because

the bridges at that time were structurally sound, properly maintained, and in no need of replacement, it reasoned that no further action was required under the Agreement.

The City initiated the instant action in Michigan's Wayne County Circuit Court on February 21, 1997, seeking declarations both that Conrail's participation in the beautification project was required by the express terms of the Agreement and that its failure to participate constituted a breach of the Agreement's requirement that each signatory "maintain, repair, and renew" the structures for which it is contractually responsible. Conrail removed the action to the United States District Court for the Eastern District of Michigan on March 25, 1997, based on that court's diversity jurisdiction. The City filed a motion for summary judgment on June 25, 1999, and a hearing to resolve the issues raised in the motion was held on August 20, 1999. Upon finding that the contract terms at issue were unambiguous and thus not properly submissible to a jury, the district court orally granted the City's motion. A provisional order granting the City's motion for summary judgment issued on October 6, 1999. The day before, on October 5, 1999, Conrail filed a motion for summary judgment, arguing that the City's claim, if one was properly stated at all, was barred both by Michigan's six-year statute of limitations period for breach-of-contract actions and by the equitable doctrine of laches. The district court denied Conrail's motion on December 15, 1999, and issued a final order on January 13, 2000, memorializing its grant of the City's motion for summary judgment and its denial of Conrail's motion for summary judgment. This timely appeal follows.

## II. CONTRACT TERMS

We review de novo a district court's grant of summary judgment. *See Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 462 (6th Cir. 1998) (citing *Middleton v. Reynolds Metals Co.*, 963 F.2d 881, 882 (6th Cir. 1992)). Summary judgment is proper if the evidence shows that there

## IV. LACHES

Conrail also contends that the City's claim is barred by the equitable doctrine of laches, which is "applicable in cases in which there is an unexcused or unexplained delay in commencing an action and a corresponding change of material condition that results in prejudice to a party." *Pub. Health Dep't. v. Rivergate Manor*, 550 N.W.2d 515, 520 (Mich. 1996) (citations omitted). We review a district court's resolution of a laches question for an abuse of discretion. *See Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 823 (6th Cir. 1981). Having already concluded that the City brought the claim within the applicable statute-of-limitations period, the doctrine of laches has no role in this case. *See Mich. Educ. Employees Mut. Ins. Co. v. Morris*, 596 N.W.2d 142, 152 (Mich. 1999) (noting that a cause of action filed within the six-year statute-of-limitations period is presumptively reasonable, thus rendering inapplicable the laches doctrine). The district court therefore properly dismissed Conrail's motion for summary judgment on this basis.

## V. CONCLUSION

The intent of the contracting parties, as derived from the language "maintain, repair and renew," is ambiguous and thus properly resolved only by a jury. Accordingly, we **REVERSE** the district court's grant of the City's motion for summary judgment. We find no error, however, in its conclusion that the City's claims were not time-barred or otherwise precluded by the equitable doctrine of laches, and thus **AFFIRM** its denial of Conrail's motion for summary judgment.

the district court denied Conrail's motion for summary judgment on this basis.

Although not without some force, Conrail's argument is unpersuasive. A district court's determination of whether a claim is barred by a statute of limitations is a question of law that we review de novo. *See Tolbert v. State of Ohio Dept. of Trans.*, 172 F.3d 934, 938 (6th Cir. 1999). Under Michigan law, a breach-of-contract claim accrues on the date of the breach. *See Am. Med. Sec., Inc. v. Auto Club Ins. Ass'n*, 238 F.3d 743, 749-50 & n.1 (6th Cir. 2001). Our review of the record suggests that it was not until 1993 that the parties to the Agreement ever contemplated the railroads' participation in a cosmetic improvement program. Because we have already concluded that the Agreement language may encompass the type of cosmetic "renewal" that the City urges -- precisely because the term is susceptible to multiple interpretations -- it would necessarily follow that Conrail's breach of the Agreement, if one occurred at all, was as recent as 1993, when Conrail refused to participate in the beautification project.[1] We therefore find no error in the district court's denial of Conrail's motion for summary judgment on this basis.

---

[1] Were we to accept the City's definition of "renew" and require Conrail to restore its bridges to a like-new quality, then Conrail would be under a continuing duty to restore its bridges or face a possible suit for breach of contract. We note that such a construction would likely raise a statute-of-limitations bar to the instant action, as Conrail would have breached the Agreement several years ago when it failed to restore the decaying bridges to their original conditions. To the contrary, we are persuaded that if the Agreement included an intention to bind the railroad to a beautification project -- as already noted, a question we cannot resolve -- then any breach could occur only at such time as the railroad refused to participate.

is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Davis*, 157 F.3d at 462 (citing *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 250 (6th Cir.1994)). We consider all facts and inferences drawn therefrom in the light most favorable to the nonmovant. *See Davis*, 157 F.3d at 462.

In a diversity action such as the instant one, we apply the substantive law of the forum state -- Michigan, in this case. *See Hanover Ins. Co. v. Am. Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994). Whether or not a contract is ambiguous is a question of law properly determined by the district court. *See Saulte Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir. 1998). In making such a determination, a district court is counseled to read the contract as a whole, and to give the contract language its ordinary and natural meaning. *See Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993). A district court's role in construing the terms of a contract is not unqualified, however. "Where [a contract's] meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions." *D'Avanzo v. Wise & Marsac, P.C.*, 565 N.W.2d 915, 918 (Mich. Ct. App. 1997) (internal citations and quotation marks omitted). The rule of law that has emerged from *D'Avanzo*, one which guides our consideration of this case, is that "[a] contract is ambiguous if the language is susceptible to two or more reasonable interpretations." *Id.*

The parties suggest that proper resolution of this appeal requires a close examination of paragraphs 14 and 16 of the Agreement:

14. The Railroads each agree to cause the details of design and construction of all bridge structures, including both substructures and superstructures to conform in appearance and architectural lines to a single standard, and the Railroads further agree that drawings covering all

such design and construction shall be subject to the approval of the Board in the above regard.

    . . . .

16.  After the completion of the works herein provided for, each Railroad agrees to maintain, repair and renew at its own expense, all parts of its bridge structures, track structures, retaining walls, piers, abutments and wingwells, within the lines of its right-of-way; . . . .

The City emphasizes that paragraph 14 fails to use the modifier "new" to describe the "design and construction" of the bridges, and thus should be read to encompass all construction pertaining to the railroad bridges, and not solely new design or new construction, as Conrail submits. We disagree. Although the City argues otherwise, we do not believe that Conrail's participation in a beautification project and any attendant bridge improvement at all concerns design or construction, as provided for in paragraph 14. By the parties' own admissions, when the Agreement was entered into in 1927, the bridges in question had not yet been constructed. Thus, properly viewed in this context, paragraph 14 would seem to govern the procedures *ex ante* by which the parties were to design and construct the bridges. Paragraph 16, by contrast, as evidenced by its use of the phrase "[a]fter the completion of the works herein provided for," sets forth the duties of the railroads with respect to the bridges once constructed. We thus turn our attention to paragraph 16, which presents us with the core issue of contention, *i.e.*, whether its use of the phrase "maintain, repair and renew" indicates a clear intention of the contracting parties to require Conrail to participate in a cosmetic improvement program that was not expressly contemplated at the time that the parties entered into the Agreement.

If the words "maintain, repair and renew" are susceptible to at least two reasonable interpretations, then we must reject the district court's finding and reverse its grant of summary judgment. Where a contract provides little guidance in interpreting a disputed term, we may properly look to the

### C. Conclusion

The language of the Agreement is ambiguous. A host of competing definitions, a scarcity of controlling caselaw interpreting the terms at issue in this case, and a seemingly inconsistent understanding of the terms by the parties as evidenced by their respective conduct confirm this point. The *D'Avanzo* standard is clear: Where disputed contractual language is subject to multiple reasonable interpretations, a reviewing court must conclude that that language is ambiguous. Thus, the intent of the parties at the time that they entered into the Agreement concerning Conrail's participation in a bridge beautification project and the extent to which Conrail is contractually responsible for making cosmetic improvements of its bridges are issues of fact properly resolved by a jury. The district court's grant of summary judgment on this basis was error.

### III. STATUTE OF LIMITATIONS

Conrail maintains now, as it did before the district court, that any cause of action for its alleged breach of contract is barred by Michigan's statute of limitations, which requires that such an action be initiated within six years of the alleged breach. *See* Mich. Comp. Laws Ann. § 600.5807(8) (West 2001). Conrail argues that because the railroad has never "maintain[ed], repair[ed] and renew[ed]" the bridge for cosmetic purposes, it necessarily breached the contract decades before the City initiated the instant lawsuit. In fact, Conrail suggests, if the City stands by its proposed definition of "renew," then Conrail's 1987 repair actions *a fortiori* constituted a breach of the Agreement because such actions maintained only the structural soundness of the bridges and failed to return them to their "original" conditions. The City responds that Conrail breached the Agreement in 1993 when it refused to participate in the beautification project, and its initiation of this action in 1997, four years after this alleged breach, was therefore timely. Rejecting Conrail's argument,

*Hampers*'s definition properly supports the City's contention that Conrail is contractually responsible for restoring to a new condition the bridges at issue, which would necessarily entail certain cosmetic modifications. We thus cannot conclude that "repair," as used by the parties in paragraph 16, unambiguously requires Conrail to perform on its bridges the cosmetic improvements requested by the City.

Conrail, setting forth its strongest argument that the terms are ambiguous, points to ten different accepted definitions of "renew," including "to repair" and "to replace," and argues that even the dictionary relied upon by the City provides several competing definitions of "renew." The City, by contrast, focuses only on one definition of "renew": "to be restored to a former state; become new or as if new again." Perhaps recognizing that no Michigan court ever has attempted to define "renew," the City relies upon an Iowa case, *Walker v. Dwelle*, 175 N.W. 957 (Iowa 1920), to support its position. There, the Iowa Supreme Court concluded that "renew" means "to reconstruct" and defined "repair" as "to mend, add to, or make over; restore to a sound condition after decay, waste, injury, or partial destruction." *Id.* at 960. In another case, one of the few we have uncovered in which a court has defined "renew," the Pennsylvania Supreme Court specifically found that the word "renew" entailed an obligation to make like new. *See Penn. R. Co. v. Penn.-Ohio Elec. Co.*, 145 A. 686, 687 (Pa. 1929).

We cannot conclude whether the term "renew," as contemplated by the parties to the Agreement, was intended to suggest an idea of outright bridge replacement or one of bridge reconstruction or merely one of restoration to a new quality or condition by resort to cosmetic enhancements. Precisely because there are multiple definitions of "renew," we must conclude that interpretation of the term is ambiguous under the *D'Avanzo* standard.

plain language of the contract, *see N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1278 (6th Cir. 1997); to relevant dictionary definitions of the term, *see Kerns, Inc. v. Wella Corp.*, 114 F.3d 566, 569 (6th Cir. 1997); to other decisions of courts that have previously interpreted the term, *see United Nat'l Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 450-52 (6th Cir. 1999); to the standards and practices within the relevant industry, *see Booth v. N. Am. Aluminum Corp.*, 423 F.2d 545, 547 (6th Cir.1970); and to how the parties' actions during the pendency of the agreement have reflected an understanding of the term, *William C. Roney & Co. v. Fed. Ins. Co.*, 674 F.2d 587, 590 (6th Cir. 1982). A careful review of each of these considerations reveals that the substance and extent of Conrail's obligations under the Agreement, and the subsidiary question of whether Conrail is contractually responsible for the cosmetic improvements of its bridges, is subject to more than one reasonable interpretation. That question, therefore, is properly resolved by a jury, and accordingly, the district court's conclusion cannot stand.

### A. Industry Standard & Prior Dealings

The standards and practices within the railroad industry and the prior dealings between the City and Conrail suggest a significant divergence between the district court's conclusion and what the terms of the Agreement expressly require. First, Conrail appended to its motion for summary judgment uncontroverted affidavits asserting that the accepted practice in the railroad industry is not to interpret such language as to require cosmetic improvements. We are unconvinced that the credibility of these affidavits is undercut by the City's unsupported assertion that the other parties to the Agreement participated in the beautification project because they believed that the Agreement demanded such performance.

Second, we note that the City raised no objection to Conrail's performance of its obligations under the Agreement until the City began its beautification project in the early 1990s. Even the district court expressed "some pause in [its]

direction . . . by the fact that over a relatively long period of time . . . the parties have apparently interpreted the language in a way that didn't impose a particular duty that required the railroad [to participate in such a program]."

Finally, the district court also had before it correspondence from the County acknowledging that since the mid-1980s, Conrail's maintenance of the bridges in question has complied with the Agreement. Even a report cited by the City and prepared by an independent engineering consulting firm provided definitions of the disputed terms that bolster Conrail's position and support our conclusion that the Agreement is susceptible to multiple interpretations:

> Maintenance involves routine actions (such as cleaning, painting), designed to preserve the condition of the structure. Repair involves performing specific actions to address localized areas of distress.  (e.g. Patching) Renew or rehabilitation of the structure entails systematic activities to improve the serviceability level, extend the performance life, and generally restore a structure to functional adequacy.

### B. Dictionary Definitions & Interpretive Caselaw

There appears to be no dispute concerning the definition of "maintain." The dictionary relied upon by Conrail suggests an idea of keeping in an existing state of efficiency. *See* American Heritage Dictionary (2d Collegiate ed. 1987). The City urges similar definitions: "to keep in due condition, operation or force; keep unimpaired," Webster's Encyclopedia Unabridged Dictionary of the English Language 865 (1994), and "to care for (property) for purposes of operation productivity or appearance; to engage in general repair and upkeep," Black's Law Dictionary 965 (7th ed. 1999).

The precise definitions of "repair" and "renew" are less easily determined. While there appears to be no real dispute between the parties concerning the dictionary definitions of "repair" -- each party asserts that "repair" is properly defined as restoring an object to a sound condition after damage or decay -- the cases they cite in support of their respective positions reflect a lack of consensus, as a review of *Hampers v. Darling*, 166 A.2d 308 (Pa. 1960), and *Walker v. City of Detroit*, 106 N.W. 123 (Mich. 1906), reveals.  At issue in *Hampers* was the interpretation of a lease clause providing that "the lessee shall at all times maintain and keep in good repair the motor and other equipment which operates a well for the premises." 166 A.2d at 309. The *Hampers* Court, in construing "to maintain and keep in good repair," found that the phrase implies "the preservation of the status quo, or a restoration approximately to the original condition," but refused "to construe [the phrase] as being synonymous with the term 'replace,'" noting that the parties would have used the word "replace" had they intended the lease agreement to so provide. *Id.* at 310. The City suggests that *Hampers*, when considered in light of commonly accepted dictionary definitions of "repair," supports its position, emphasizing such definitions as "to restore to a good or sound condition after decay or damage; mend" and "to restore or renew by any process of making good."

In what is apparently the only Michigan case to have defined "repair," the Michigan Supreme Court found that "repair" related to keeping the object in question "in a serviceable and safe condition." *See Walker*, 106 N.W. at 1124.  Unlike the Pennsylvania Supreme Court in *Hampers*, the *Walker* Court refused to extend its definition to include construction or reconstruction, limiting it instead to modifications that neither change the character of, nor result in a substitution of, the object in question. *See id.* at 1124-25. We find *Walker* instructive inasmuch as its definition of "repair," different from that set forth in *Hampers*, supports Conrail's position that the disputed terms are in fact ambiguous. Indeed, *Walker*'s definition supports Conrail's assertion that it is required only to maintain the bridges for which it is responsible in a serviceable and safe condition without undertaking purely cosmetic improvements;