**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0269n.06
Filed: April 18, 2006

No. 05-1534

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

REHABILITATION INSTITUTE, INC., D/B/A
REHABILITATION INSTITUTE OF MICHIGAN,
    *Plaintiff-Appellant,*

                                          On Appeal from the
      v.                              United States District Court for
                                          the Eastern District of Michigan

MICHIGAN UNITED FOOD AND COMMERCIAL
WORKERS HEALTH AND WELFARE FUNDS,
    *Defendant-Appellee*.

_____

Before: KENNEDY, MOORE, and SUTTON, Circuit Judges

**KENNEDY, J.** Rehabilitation Institute of Michigan ("plaintiff") seeks to recover from the

Michigan United Food and Commercial Workers Health and Welfare Funds ("defendant") the costs

of providing rehabilitation services for Terence D. Williams, Jr. ("Williams, Jr."), the 17-year old

son of Terence B. Williams ("Mr. Williams") and Stephanie Williams. For the following reasons,

we hold that the district court incorrectly interpreted the portion of defendant's Employee

Retirement Income Security Act of 1974 ("ERISA") plan that defines eligible dependents, and we

**REVERSE** the decision of the district court and **REMAND** for further proceedings.

**BACKGROUND**

Mr. Williams' employer contributed to defendant on behalf of Mr. Williams for 2003, the

year in which plaintiff provided services to Williams, Jr. Mr. Williams listed Williams, Jr. on his

benefit enrollment form in 1999 and a subsequent dependent enrollment update form on August 2,

2002. Stipulated Factual Record ("S.F.R.") at 0000202-03. Defendant does not dispute that Mr. Williams was an eligible employee of a contributing employer during 2003.

Williams, Jr. was born on June 26, 1986. His parents were married on November 28, 1998. Williams, Jr. has had difficulty interacting with his parents and siblings. On June 22, 2002, Williams, Jr. attacked his father with a knife. *Id*. at 0001179. He was in custody for that crime from June 24, 2002 until August 2, 2002. *Id*. at 0001184-86. On August 2, 2002, the Family Division of the Wayne County Third Judicial Circuit Court took Williams, Jr. into the temporary custody of the court. He was released into the community, and he continued living in his parents' home. *Id*. He was assigned to a family service agency and received individual and group counseling. On April 11, 2003, Williams, Jr. was taken into custody as a result of assaults against his sister's boyfriend and his suspensions from school. *Id*. at 0001198. Escalation to a secure facility was recommended after a hearing, and on May 16, 2003, Williams, Jr. was placed at the Bradley Behavioral Mental Health Center ("Boysville") for in-patient treatment. *Id*. at 0001208. He remained at Boysville during the week, but was released to his parents' home on several weekends. *Id*. at 0000858.

On August 17, 2003 (a Sunday), Williams, Jr. was released by Boysville on an apparently unauthorized home pass. *Id*. at 0001217. During this unauthorized release, Williams, Jr. was a passenger in a car fleeing the police, was shot by the police, and paralyzed from the neck down.[1] *Id*. at 0000223. He was hospitalized at Children's Hospital in Detroit from August 17, 2003 until

---

[1]Williams, Jr. was reported to have been tampering with cars. Police officers investigated the report by stopping the car in which Williams, Jr. was riding at an intersection. The officers blocked the car on both sides by using their police cruisers. As an officer approached the car, the driver of the car in which Williams, Jr. was riding backed the car up in an attempt to get away. The driver then accelerated the vehicle forward and knocked over one of the officers. One of the officers fired four shots at the vehicle. One of the shots hit Williams, Jr. in the neck.

2

November 6, 2003. He was then moved to plaintiff's facility for rehabilitation. On December 5, 2003, after he completed his rehabilitation, he was released back into the custody of his parents. *Id.* at 0000313. The Wayne County Family Court terminated its temporary wardship over him in January of 2004.

Plaintiff, after receiving an assignment of benefits from the Williams, sought payment from defendant for the period Williams, Jr. had spent in its care (November 6, 2003 until December 5, 2003). In a letter to Mr. Williams dated January 22, 2004, Defendant responded stating:

> It is unclear whether your son was dependent on you for his primary support and maintenance at the time of his injury. To qualify as an "eligible dependent" over half of his support and maintenance would have to be provided by you. To verify his status please forward a copy of your 2002 and 2003 federal income tax returns. If you have not yet filed for 2003, please provide other evidence of your obligation. Evidence that you are that primary source of shelter, food, clothing, education and the like may include copies of checks, money orders, receipts or other proof that you paid for his care."

*Id.* at 0000226.

Though defendant apparently determined that Williams, Jr. was not primarily dependent on Mr. Williams for his support and maintenance during 2003, and refused to pay plaintiff's claim, it did not specifically deny the claim, provide reasons for its denial, or state the mechanism for an appeal. Plaintiff filed suit in Wayne County Circuit Court on May 24, 2004. Defendant removed that action to federal district court.

After some discovery efforts and pretrial conferences, the district court issued an order, which included the following language:

> Both parties further agreed that the court should examine the issue of whether the claimant Terence D. Williams, Jr. was "primarily dependent" on his father Terence B. Williams (a covered individual under the ERISA plan at issue) for support and maintenance de novo, and that it should also consider evidence outside of the original administrative record. The parties agreed that, if the court concludes that

3

> Terence D. Williams, Jr. was not primarily dependent on his father under the ERISA plan's language, the case would end. On the other hand, if the court concludes by a preponderance that Terence D. Williams, Jr. was "primarily dependent" on Terence B. Williams, Sr. under the ERISA plan language, the court intends to remand the case for the plan administrator to determine which benefits and expenses of the claim are payable under the plan.

Joint Appendix ("J.A.") at 181-82. After both parties had offered their additional exhibits and filed their briefs, the district court found that Williams, Jr. was not an eligible dependent under the plan language because Mr. Williams did not provide a copy of his income tax return and, therefore, had not claimed Williams, Jr. as a dependent on his income tax. This income tax return, the district court held, was required under the plain language.

## ANALYSIS

Under our precedent, this court reviews the district court's determinations, both factual and legal, under the de novo standard of review. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 613 (6th Cir. 1998); *Rowan v. Unum Life Ins. Co. of America*, 119 F.3d 433, 435 (6th Cir. 1997) (interpreting *Firestone Tire and Rubber Co. v. Bruch*, 389 U.S. 101, 115 (1989)).

Plaintiff first argues that because defendant did not comply with certain time requirements under its plan, and because it did not seek further evidence from Mr. Williams regarding Williams, Jr.'s status as an eligible dependent in a timely manner, that fact alone should be determinative of this lawsuit. Defendant responds that its failure to request information regarding Williams, Jr.'s status as an eligible dependent in a timely fashion has the sole side-effect of allowing the district court to make a de novo determination with regards to plaintiff's eligible dependent status. Defendant cites *VanderKlok v. Provident Life & Acc. Ins. Co.*, 956 F.2d 610, 615 (6th Cir. 1992) in support of its view. We are unable to agree with the position of either party.

4

In its scheduling order, the district court set out what it understood to be a stipulation by both parties as to the relevant issues in this case. The district court believed and neither party disputed that it was to make a de novo finding by a preponderance of the evidence as to whether Williams, Jr. was an eligible dependent under the plan. *See* J.A. at 181-82. Because both plaintiff and defendant stipulated that the district court was to decide the issue of whether Williams, Jr. qualified as an eligible dependent, plaintiff cannot now argue that the district court should have relied on defendant's procedural failings in granting it the relief it requested. Defendant is not correct either, because this court has never held that a failure of a defendant to comply with its obligations under an ERISA plan merely changes the standard of review in the district court. *See Univ. Hosp. of Cleveland v. S. Lorain Merchs. Ass'n Health & Welfare Benefit Plan and Trust*, No. 04-4067, 2006 WL 700882, at *4 (6th Cir. March 21, 2006) (interpreting *VanderKlok* as not changing the standard of review in ERISA cases). In this case, however, defendant stipulated to a different standard of review, and we can see no reason to reject that stipulation.

We now turn to plaintiff's second argument that the district court did not accurately interpret the language of the plan, and that it should have considered the evidence as to whether Williams, Jr. was primarily dependent on his father in 2003, and thus, an eligible dependent, with out regard to whether he was claimed on his father's income tax return or whether an income tax return existed. This argument requires this court to interpret a term of an ERISA plan. "Though comprehensive in many respects, ERISA is silent on matters of contract interpretation. The courts have thus produced a body of federal common law providing such guidance." *Dixon v. Life Ins. Co. Of North America,* 389 F.3d 1179, 1183 (11th Cir. 2004); *Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1041 (11th Cir.1998) ("Courts have the authority 'to develop a body of federal common law to

govern issues in ERISA actions not covered by the act itself.' ") (citation omitted). This is an ERISA case and, as such, federal law applies, but this court takes direction from state law and general principles of contract interpretation. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) ("In developing federal common law rules of contract interpretation, we take direction from both state law and general contract law principles." (citing *Regents of the Univ. of Michigan v. Agency Rent-A-Car,* 122 F.3d 336, 339 (6th Cir.1997)).

The district court determined that "it is an explicit requirement of the ERISA Plan that the dependent child be claimed on the eligible employee's federal income tax return to be considered an eligible dependent." J.A. at 0000153. We find that the district court erred in its construction of the plain language.

Section 12 of the plan, on which this claim is predicated, reads as follows:

Section 12. Eligible Dependent.

Any or all of the following individuals:

(a)     the Eligible Employee's spouse;

(b)     those children of the Eligible Employee who are unmarried, who have not reached their 19th birthday and who are primarily dependent on the Eligible Employee for support and maintenance. For this purpose "children" shall include:

(i)     the Eligible Employee's natural children, provided the child is claimed as a dependent on the Eligible Employee's federal income tax return;

(ii)    stepchildren who are financially dependent on the Eligible Employee and who reside with the Eligible Employee in a regular parent-child relationship, provided that there is no court order or agreement in existence whereby the obligation to provide primary support or medical coverage for a stepchild is the obligation of an individual other than that Eligible Employee's spouse; and

6

(iii)    legally adopted children or those for whom adoption proceedings have been started and the children are placed in the Eligible Employee's home by a licensed placement agency for the purpose of adoption or, if the children have been living in the Eligible Employee's home as foster children for whom foster care payments are being made and petition for adoption has been filed;

S.F.R. at 0000286-87 (the plan goes on to include several other groups of people including grandchildren of an eligible employee for whom the eligible employee has been appointed as legal guardian, brothers and sisters of the eligible employee who are wards of the eligible employee, etc.). The district court held that because Section 12, subsection(b)(1) of the plan required that "natural children"[2] be claimed on an income tax return, all dependents of the eligible employee had to be

---

[2]The plan does not explicitly define the term "natural children," and the term is susceptible to two different definitions. *See* BLACK'S LAW DICTIONARY 255 (8th ed. 2004). The term natural children can mean all biological children. *See id.* (definitions one and two). Alternately, the term natural children can refer specifically to illegitimate children. *See id.* (definitions three and four). Black's Law Dictionary does note that this second definition of the term is "archaic." *Id.* Nevertheless, we believe that in light of the way in which the term is used in the plan, it is entirely possible that the drafters of the plan intended to use this latter definition.

If the drafters of the plan did intend the term natural children to refer to illegitimate children, it is not even clear if the term would apply to Williams, Jr. Michigan law may no longer recognize any difference between legitimate children and illegitimate children in light of the fact that no notation of whether the child is legitimate appears on a Michigan birth certificate. *See* MICH. COMP. LAWS § 333.2824(7) (2001) ("After May 30, 1979, a birth certificate shall not contain a reference to the legitimacy or illegitimacy of a child."). Furthermore, it appears that Michigan law long recognized that illegitimate children became legitimate when their biological parents married. *See* MICH. COMP. LAWS § 13443 (1929) ("When after the birth of an illegitimate child, his parents shall intermarry . . . such child shall be considered legitimate for all intents and purposes."); *Mich. Comp. Laws* § 702.83 (1948) (repealed 1978 Mich. Pub. Acts 2585).

Because Williams, Jr. was born to unwed parents who later wed, we believe, then, that insofar as Michigan law still recognizes a difference between legitimate and illegitimate children, a Michigan court would likely consider Williams, Jr. to be a legitimate child as of the date of his parent's marriage.

claimed on the eligible employee's tax return to be eligible for benefits. Such an interpretation cannot be correct in light of the plain wording of the plan.

In construing a contract, we look to its plain language. *Vision Information Services, LLC. v. C.I.R.* 419 F.3d 554, 558 (6th Cir. 2005) ("We have explained that '[t]he intent of the parties is best determined by the plain language of the contract.'") (citing *United States v. Donovan,* 348 F.3d 509, 512 (6th Cir. 2003) and 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 31:4 (4th Ed.1999)). Section 12 begins with the language "[a]ny or all of the following individuals." S.F.R. at 0000286. Here, subsection (b) defines eligible dependents as "those children of the Eligible Employee who are unmarried, who have not reached their 19th birthday and who are primarily dependent on the Eligible Employee for support and maintenance." *Id*. Nothing more is required. The contract then enlarges on that definition through the language: "[f]or this purpose 'children' shall include:" (1) all natural children if claimed on the employee's income tax return, which provides an easy method of establishing primary dependency; (2) step children who reside in the employee's household with certain exceptions; (3) legally adopted children or whose adoption is proceeding.

The plan clearly defines step-children and adopted children as eligible dependents under the plan, and does not require that step-children or adopted children be claimed on an income tax return. Under the terms of the plan, the income tax return requirement only applies to natural children. In our view, the language "[f]or this purpose Children shall include:" broadens the definition of children in subdivision (b) by including children that might not otherwise be covered, such as step-children, children in the adoption process, and perhaps a child for whom a support order has been entered.

8

Requiring parents to file income tax returns in order to be entitled to claim coverage for their dependents who are natural children when it does not deny benefits to parents that provide support to step-children or adopted children, even if the eligible employee failed to claim those children on the eligible employee's tax return under the plan's plain language seems illogical. Not only would such a requirement be curious at best, such a requirement appears irrational as it would force parents of natural children, who under the biological child definition of the term are, undoubtedly, the largest class of eligible dependent children, to comply with one more step than would be required if the eligible employee's children had been adopted or were step-children.

Furthermore, if natural children must be claimed on an income tax return, the plan could avoid paying benefits for a newborn that has not yet been claimed until the parents filed an income tax return that listed the newborn as a dependent. In such a way, a baby born early in one year would not be covered by the plan until the parents filed the tax return for that year the following April. The drafters of the plan cannot have intended such a result.

In contrast, if the purpose of subsection (i) is to broaden the definition of children to include any natural child, rather than a means of limiting the definition of children, or to provide an easy method of establishing whether a child is primarily dependent on an employee, the plan structure makes sense. Subsections (i), (ii), and (iii) of section 12, subsection (b) could then be viewed as expansions to the definition of children as that term had been previously defined in section 12, subsection (b). Viewed in such a way, the plan would define eligible dependents broadly, rather than simply limiting the coverage. In light of the fact that subsection (ii) expands the definition of children to include dependents of eligible employees who are step-children, and that subsection (iii) expands the definition of children to include dependents of eligible employees in the adoption

9

process, we view subsection (i), (ii), and (iii) as terms that broaden the definition of children under subsection (b), giving effect to the language "shall include," rather than as terms that limit the definition of children.

The income tax requirement, properly read, becomes a means by which parents of natural children can meet the primary dependent requirement by proving that the parents claimed the child in question on an income tax return. If the parents cannot or will not provide an income tax return, they may still prove that the child meets the primary dependency on an eligible employee test by proving support and maintenance.

At oral argument, counsel admitted that the plan has not, in the past, required eligible employees to provide an income tax form if the eligible employee can prove that a child is an eligible dependent through other means. Indeed, in this case, the record indicates that the plan asked Mr. Williams for a tax return, or, in the alternative for other evidence proving that he was the primary source of Williams Jr.'s support, such as "copies of checks, money orders, receipts or other proof that you paid for his care." S.F.R. at 0000226. If the plan's general practice is to not require an income tax return to prove that a child is an eligible dependent, it would be odd for this court to contradict that past practice with a narrower reading of defendant's own plan. *Cf. City of Wyandotte v. Consolidated Rail Corp.*, 262 F.3d 581, 586 (6th Cir. 2001) ("We may properly look . . . to how the parties' actions during the pendency of the agreement have reflected an understanding of the term.") (citing *William C. Roney & Co. v. Fed. Ins. Co.,* 674 F.2d 587, 590 (6th Cir.1982).

Because Mr. Williams did not need to prove that he claimed Williams, Jr. on an income tax return, in order to qualify as an eligible dependent, under Section 12, subsection (b), plaintiff must only show that Williams, Jr. was (1) unmarried, (2) had not reached his 19th birthday, and (3) that

10

he was primarily dependent on Mr. Williams for his support and maintenance during the year in question. The district court did not make a finding as to whether Williams, Jr. was an eligible dependent under these criteria. In the last paragraph of its opinion the district court wrote:

> Even assuming, arguendo, that Plaintiff can show that Williams Sr. did claim Williams Jr. on his income tax returns, it is not clear that Plaintiff can fulfill the first requirement of proving eligible dependence, which involves showing that Williams Jr. was primarily dependent on Williams Sr. for maintenance and support. The fact that Williams Jr. did not live at his parents' home for at least seven and a half months during 2003 casts some doubt on his eligible status. He was in the custody of the State for four months while at Boysville and the court records do not indicate who shouldered the cost.

J.A. at 156. While this language certainly expresses skepticism with respect to whether Williams, Jr. was an eligible dependent, it cannot be read as being an explicit finding that he was not. The district court's findings of fact, however, do indicate that it would be inclined to find that Williams, Jr. was not an eligible dependent.

The district court found that Williams, Jr. did not live at his parents' home for seven and a half months during 2003, the four months in Boysville, plus the three months at Children's Hospital. While we generally agree with those findings, we disagree with the relevancy of these facts to the issue of whether Williams, Jr. was primarily dependent on his father for the year 2003.

By our calculations, Williams, Jr. was in his parents' home for approximately four months, from January 1, 2003 until April 11, 2003, and again from December 5, 2003 until the end of the year. He was either in custody or in the in-patient treatment facility, Boysville, for approximately four months, from April 11, 2003 until August 17, 2003. He was in the Children's Hospital for approximately three months, from August 17, 2003 until November 6, 2003. He was in plaintiff's care for rehabilitation for approximately one month, from November 6, 2003 until December 5, 2003.

11

While it is indisputable that Williams, Jr. did not physically reside in his parents' home for eight months of 2003, the amount of time that he spent in the physical home of his parents, under these facts, is not the sole measure of who was primarily responsible for his support. The record does not provide any evidence as to who paid for Williams, Jr.'s care when he was in the in-patient treatment facility (Boysville). Plaintiff does not claim that Mr. Williams was responsible for that time; thus, we will assume the state supported Williams, Jr. during that time. Further, Williams, Jr. still lived in his parents' home for four months, and defendant does not appear to dispute that they provided him support during that time.

M-Child, a program for the state of Michigan to provide medical care for minors whose parents lack medical insurance and meet certain income requirements, paid for Williams, Jr.'s care while he was in Children's Hospital. Under M-Child eligibility rules, it should not have paid for the care if a parent had insurance. But even if M-Child properly covered Williams, Jr.'s time in the hospital, that fact would not indicate who provided his primary support for that time. Defendant argues that tax-exempt monies received by Williams, Jr. in the form of government benefits, including medical benefits, are included as part of the support test for dependency. Defendant cites I.R.S. Publication 17, *Your Federal Income Tax*, Part One, § 3 pages 28-36 in support of this claim. *See* J.A. at 133-44. That publication, however contradicts defendant's position. On page 33 of that publication, the I.R.S. states that "Medical insurance benefits, including basic and supplementary Medicare benefits, are not part of support." Typically, a parent may still claim a child as a dependent when they spend a large amount of time in a hospital.[3] If, according to a fair reading of

---

[3]As a parent of a minor, Mr. Williams is liable under Michigan law for the services rendered by plaintiff. *Cf. Scholten v. Rhoades*, 242 N.W.2d 509, 513 (Mich. Ct. App. 1976) (addressing the dram shop law, but noting that "[a] parent is legally responsible for the medical bills of his minor

an IRS publication, medical insurance benefits are not figured into the support test, it would seem that this general rule regarding parental support should not be disturbed, even when Medicaid or some other government program pays for the hospitalization. Absent further evidence, the parents should be credited with providing Williams, Jr.'s support during this time. We would, therefore, include the months in Children's Hospital as months for which Mr. Williams provided support and maintenance. The evidence then would indicate that Williams, Jr. was supported by his parents for at least eight months of 2003.

We would also note that Mr. Williams listed Williams, Jr. on his enrollment form twice in the past, including for the year in question,[4] and that some evidence in the record would seem to indicate that Medicaid has declined coverage for some of his claims. S.F.R. S0000809-S0000818. Though the amounts listed in those claims are small, they do provide some support that Medicaid has made a determination that it is not the primary liability carrier for Williams, Jr.

Furthermore, while defendant makes much of the fact that Williams, Jr. was a temporary ward of the court during the year of 2003, we do not see how that fact alone proves who was responsible for his support, and defendant does not explain how it does. Williams, Jr. became a temporary ward of the court pursuant to a family court order on August 2, 2002. But, he lived at home with both of his parents until April 11, 2003 and again in December of 2003. Under these facts, during the majority of his year-and-a-half wardship, Williams, Jr. lived at home (from August

child . . . ."), *superseded by statute* on other grounds, *as recognized in LaGuire v. Kain*, 487 N.W.2d 389 (Mich. 1992).

[4]We are unpersuaded by the fact that after Williams, Jr. was shot, Mr. Williams declined to return yet another form identifying his dependents that he allegedly received on or around November 26, 2003. S.F.R. at 0000840. If Mr. Williams had returned the form without listing Williams, Jr., we might draw a different conclusion, but we are not inclined to do so based on his inaction alone.

of 2002 until April of 2003 and again in December of 2003), and was presumably being supported by his parents. In addition, this court has already indicated that, absent further evidence, the time that he was in the hospital and rehabilitation should be counted as time that his parents provided him support. Thus, the fact that he was a temporary ward of the court does not significantly aid this court in determining who was responsible for his support during 2003.

Though we review the district court's factual determinations de novo, where the district court has not yet made the definitive factual determinations, we remand the case to that court to make the determinations in the first instance. We believe that this course is the appropriate one in light of the fact that the district court can more easily take further evidence, hold evidentiary hearings, and, in general, find facts than can this court. In addition, though our standard of review would permit us to make a definitive ruling on the record, that procedure would limit each party's ability to have factual errors corrected on appeal.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** for further proceedings.