**PETRO FRANCHISE SYSTEMS, LLC; and TA Operating, LLC, Plaintiffs,**

v.

**ALL AMERICAN PROPERTIES, INC.; et al., Defendants.**

**All American Properties, Inc.; All American Plazas, Inc., Counter Plaintiffs,**

v.

**Petro Franchise Systems, LLC; and TA Operating LLC, Counter Defendants.**

**No. EP–08–CV–387–KC.**

United States District Court, W.D. Texas, El Paso Division.

March 19, 2009.

Jeanne C. Collins, Mark N. Osborn, Richard Andrew Bonner, Kemp Smith LLP, El Paso, TX, for Plaintiffs.

Joseph L. Hood, Jr., Windle Hood Alley Norton Brittain & Jay, LLP, El Paso, TX, for Defendants.

### ORDER

KATHLEEN CARDONE, District Judge.

On this day, the Court considered "Plaintiffs' Application for Preliminary Injunction Against Defendants All American Properties, Inc. and All American Plazas, Inc." ("Plaintiffs' Application") (Doc. No. 15) and "Defendants' Application for a Temporary Restraining Order and Preliminary Injunction" ("Defendants' Application") (Doc. No. 25). For the reasons set forth herein, Plaintiffs' Application is **GRANTED** in part, and Defendants' Application is **DENIED**.

### I. BACKGROUND

The following derives from Plaintiffs' Application, the included "Declaration Under Penalty of Perjury" ("Plaintiffs' Declaration"), and the exhibits attached thereto; "Defendants' Response to Plaintiffs' Application for a Preliminary Injunction" ("Defendants' Response") (Doc. No. 21), the included "Declaration of Richard A. Mitstifer" ("Mitstifer Declaration"), and the exhibits attached thereto; "Plaintiffs' Reply to Defendants' Response to Plaintiffs' Application for a Preliminary Injunction" ("Plaintiffs' Reply") (Doc. No. 26), and the exhibits attached thereto; Defendants' Application; "Plaintiffs' Response to Defendants' Application for Preliminary Injunction" ("Plaintiffs' Response") (Doc. No. 30); "Defendants' Reply in Support of Their Application for a Preliminary Injunction" ("Defendants' Reply") (Doc. No. 31); Plaintiffs' "Complaint" (Doc. No. 1), and the exhibits attached thereto; "Defendants' Answer" (Doc. No. 13); "Defendants' Original Counterclaim" ("Counterclaim") (Doc. No. 29); and Plaintiffs' "Original Answer of Petro Franchising [sic] Systems[,] LLC and TA Operating LLC to Defendants' Original Counterclaim" ("Plaintiffs' Answer") (Doc. No. 32).

Beginning in 1975, Petro Franchise System, LLC ("Petro"), through its predecessor in interest, "developed ... a unique system (the 'Franchise System') for the operation of full-facility truck/auto travel centers [ ] comprised of fueling, merchandising, restaurant and preventative main-

tenance operations which are operated under the Petro trademark and trade name." Pls.' Decl. 1. As its name indicates, the Franchise System consists of franchises granted to individuals and businesses. *Id.* at 2. In 1998, Petro first granted franchises for travel centers located in Breezewood, Pennsylvania ("Breezewood Franchise") and Milton, Pennsylvania ("Milton Franchise"). Defs.' Decl. 1–2. The most recent franchise agreements for both Franchises took effect on October 23, 2003. *See* Pls.' Application Ex. 1 at 1–2 ("Breezewood Franchise Agreement"); *id.* Ex. 2 at 1–2 ("Milton Franchise Agreement").[1]

The Franchise Agreements provide for, inter alia, the franchisee's permissible use of Petro's proprietary marks, the scope of the franchisee's exclusive franchise area, the calculation of and procedure for franchise fees remitted to Petro, the franchisee's use of Petro's confidential information, events which may lead to default and termination, and the parties' rights and duties upon termination. *See generally* Pls.' Application Ex. 1 at 2, 4, 10–16, 26–31, 45–46.[2] The Agreements are both governed by Texas law. *Id.* at 57. The proprietary marks referenced in the Franchise Agreements and the operating assets of the Franchise System are currently owned by Plaintiff TA Operating, LLC ("TA"). Pls.' Application 1. Plaintiff Petro is the current franchisor and has the right to sub-license TA's proprietary marks. *Id.* at 2. Defendants All American Properties, Inc., and All American Plazas, Inc. (collectively "Franchisees"), are the current franchisees of the Breezewood and Milton Franchises, respectively.

Franchisees state that they "enjoyed a good and valuable relationship" with Petro from the date of the agreement until May 30, 2007. Defs.' Application 3. On that date, Petro's predecessor was acquired by Travel Centers of America, LLC, an affiliate of Plaintiff TA,[3] which operated five travel plazas within Franchisees' exclusive franchise area under the TA brand. *Id.* Franchisees claim that after the acquisition TA began to integrate the TA brand with the Petro brand by, for example, combining the brands' roadside assistance programs and rewards programs. *Id.* at 4. Franchisees believe that this integration diminished the value of the Petro brand and led to a substantial decline in their business. *Id.* at 4–5. Their concern led them to meet with other Petro franchisees and, in February 2008, with TA's senior management. *Id.* at 6.

On February 13, 2008, Franchisees' attorney sent Petro a letter responding to "[Petro's] purported notice of default set forth in [a] letter of December 28, 2007[,] regarding the Breezewood and Milton truck stop plazas. . . ." Pls.' Reply Ex. C at 1. The letter stated that Franchisees "are no longer interested in having [a] truck stop plaza located at Frystown [, Pennsylvania] converted to a Petro franchise and accordingly, are seeking release from escrow of [ ] $500,000 being held. . . ." *Id.* Among the reasons given for Franchisees' disinterest was their "belie[f] that the Petro mark has substantially diminished in value since the acquisition of Petro by TA." *Id.* at 2.

---

**1.** The Breezewood and Milton Franchise Agreements are almost entirely identical. Accordingly, unless stated otherwise, all references to either Franchise Agreement are to the Breezewood Franchise Agreement.

**2.** The Franchise Agreements provide for distinct exclusive franchise areas. *Compare* Pl.'s

Application Ex. 1 at 63–64 (Breezewood Franchise), *with id.* Ex. 2 at 63–66 (Milton Franchise).

**3.** For the sake of clarity, the Court will refer to both companies as TA.

On March 11, 2008, Plaintiffs and Franchisees entered into a "Confidential Settlement Agreement and Mutual General Release." *See* Defs.' Resp. Ex. E ("Release"). The Release provided that the $500,000 of escrow funds would be disbursed to Petro "to cure the monetary default under the Breezewood Franchise Agreement," "to cure the monetary default under the Milton Franchise Agreement," "as advance payments for sums due Petro under the Breezewood Franchise Agreement and Milton Franchise Agreement," and "as a security deposit . . . to secure the obligations of [Franchisees] under the Breezewood Franchise Documents and Milton Franchise Documents." *Id.* at 3–4. Additionally, Franchisees agreed to release Petro and its associated entities from any claims "relating to or in anyway [sic] connected to any matter, including . . . [the] Breezewood Franchise Documents . . . [the] Milton Franchise Documents . . . and the allegations raised in [Franchisees' counsel's] letter of February 13, 2008. . . ." *Id.* at 6. However, the Release did not extend to "claims first arising solely after the date of [the Release]." *Id.* at 7.

Plaintiffs state that the funds from the Release were applied to franchise fees owed for March 2008 and April 2008. *See* Compl. ¶¶ 46–47; Pls.' Application 9. They allege that "[s]ince that time, neither [Franchisee] has remitted any payments due under their respective [F]ranchise [A]greements." Pls.' Application 9. Franchisees do not dispute that they did not remit any payments for fees owed after April 2008. However, Franchisees argue that Plaintiffs "placed [Franchisees] in the position of being unable to pay [those] fees." Defs.' Reply 1. Pursuant to the

default provisions of the Agreements, Petro sent Franchisees several notices in July 2008 and August 2008 notifying Franchisees that they had defaulted on the Agreements. *See id.* Exs. 4–7.

After Franchisees failed to cure their alleged default by making payments, and pursuant to the termination provisions of the Franchise Agreements, Petro sent letters to Franchisees confirming that the Franchise Agreements were automatically terminated as of August 29, 2008. *Id.* Exs. 8–9. In response, Franchisees stated that they "feel very strongly that they are not receiving the benefits of the [F]ranchise [A]greements" because TA's acquisition of Petro has "led to a substantial decrease in revenues[,] making it more and more difficult to pay. . . ." Defs.' Resp. Exs. B–C.

Franchisees allege that they attended a meeting with TA on October 7, 2008, in which they attempted to resolve their "ongoing problems." Countercl. ¶ 22. On the same day, Plaintiffs filed their Complaint,[4] alleging trademark infringement, false designation of origin, and dilution under the Lanham Act; unfair competition and unjust enrichment; trademark infringement under Texas law; breach of contract; and conversion. *See* Compl. 15–26.

On October 15, 2008, Plaintiffs filed their Application, seeking a preliminary injunction ordering Franchisees to stop using Plaintiffs' name and trademarks, to return Plaintiffs' proprietary materials, to refrain from utilizing Plaintiffs' copyrighted works, and to comply with the post-termination provisions of the Franchise Agreements. Pls.' Application 3.

On January 6, 2009, Franchisees filed their Response. In their Response, Franchisees noted that Petro continued to rep-

---

4. Plaintiffs named The Chelednik Family Trust as a Defendant in the Complaint, alleging that it is a guarantor of Defendant All American Plazas, Inc.'s performance with re-

spect to the Milton Franchise Agreement. Compl. ¶ 13. The Chelednik Family Trust is not a party to either Application.

resent the Breezewood and Milton travel centers as Petro franchises on its website. Defs.' Resp. 10. On the same day, Petro sent an email informing their fleet-vehicle customers that "[a]ll programs run at [the Milton and Breezewood] locations as part of the Petro system are no longer available...." Defs.' Application Ex. A. On January 13, 2009, Plaintiffs filed their Reply, in which Plaintiffs stated that they have "taken a number of steps ... to prevent consumer confusion." Pls.' Reply 8. "The last of those steps," already completed on the date of the Reply, "was to remove [Franchisees] from Petro's website." *Id.*

Also on January 13, 2009, Franchisees filed their Counterclaim and their Application. In the Counterclaim, Franchisees allege that Plaintiffs breached the Franchise Agreements and breached their duty of good faith and fair dealing. Countercl. 9–10. In their Application, Franchisees request that the Court enjoin Plaintiffs from taking any action to terminate the Franchise Agreements and order Plaintiffs to send a copy of the injunction to any person who was previously told that the Franchise Agreements had been terminated. Defs.' Application 1.

## II. DISCUSSION

The parties' respective Applications are based on the same series of events, and the requested injunctions are mutually exclusive in scope. If either party's requested relief is granted in full, the Applications are a zero-sum game. However, the Court remains mindful that equity disfavors "exclusive focus upon the most drastic remedies requested by [a party] ... to the exclusion of less severe remedies[.]" *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 22–23 (7th Cir.1992); *see, e.g., Lalance & Grosjean Mfg. Co. v. Nat'l Enameling & Stamping Co.*, 109 F. 317, 318–19 (S.D.N.Y.1901) (granting preliminary injunction as to design of label but denying

as to statements in label). Because either Application or both may be granted in part, the Court will consider their merits separately.

### A. Standard

The decision whether to grant a preliminary injunction is within the discretion of a district court. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir.1989). "[A] preliminary injunction is [meant] to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 560 (5th Cir.1971) (per curiam) (citations omitted); *see also* Fed.R.Civ.P. 65; W.D. Tex. Loc. R. CV–65. "[A movant] seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that [the movant] will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the [non-movant], and (4) that the injunction will not disserve the public interest." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir.2008) (citing *Planned Parenthood of Houston & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir.2005)). Because a preliminary injunction is an "extraordinary remedy," the movant must "clearly carr[y] the burden as to all four elements." *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir.2003) (citing *Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458, 1462 (5th Cir.1990)).

### B. Success on the Merits

#### a. Plaintiffs

■■■ Plaintiffs seek a preliminary injunction on the basis of their trademark infringement claim under § 1114 of the

Lanham Act and their false designation of origin claim under § 1125(a) of the Lanham Act. *See* Pls.' Application 12–16. "To prevail on [a] trademark infringement claim, [a plaintiff] must [first] establish ownership in a legally protectible mark...." *Bd. of Supervisors for La. State Univ. Agric. and Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir.2008) (citation omitted); *see also* 15 U.S.C. § 1114. If trademark ownership is established, "[t]he Lanham Act provides a cause of action for infringement where one '(1) uses any reproduction, counterfeit, copy, or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution, or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir.2008) (quoting *Boston Prof'l Hockey Ass'n Inc. v. Dallas Cap and Emblem Mfg.*, 510 F.2d 1004, 1009–10 (5th Cir.1975); citing 15 U.S.C. § 1114). "The test for [false designation of origin] under § 1125(a) is essentially the same as that for [trade]mark infringement." *Serv. Merch. Co. v. Serv. Jewelry Stores*, 737 F.Supp. 983, 999 (S.D.Tex.1990) (citing, inter alia, *Sun–Fun Prods., Inc. v. Suntan Research & Dev., Inc.*, 656 F.2d 186, 192 (5th Cir.1981) ("scope of [false designation] inquiry is broader," looking to "similarity in the overall trade dress of the products")).

The parties do not contest that the proprietary marks described in the Franchise Agreements are legally protected, owned by TA, and licensed by Petro. *See* Pls.' Application Ex. 1–E (listing registration numbers of proprietary marks). Nor do Franchisees contest that they are using those marks in commerce and in connection with the sale, offering for sale, distribution, or advertising of any goods. Defs.' Application 12; *see also* Pls.' Application Ex. 1 at 1 (describing commercial nature of Franchise System).

■ The marks used by Franchisees are identical to Plaintiffs'. For this reason, if Franchisees' use of the proprietary marks is unauthorized, Plaintiffs are likely to succeed in establishing a likelihood of confusion or mistake. The Fifth Circuit follows a comprehensive "digits of confusion" test to determine whether confusion is likely. *See Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 829–830 (5th Cir. 1998).[5] "In determining the likelihood of confusion, the district court must apply [that] test." *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 257 (5th Cir.1997). However, a district court may confine its digits-of-confusion analysis to the determination that the marks used by the allegedly infringing party are the exact marks owned by the plaintiff and, if they are, find that confusion is likely. *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 310 (5th Cir.2008); *see also Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir.1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks."). Here, Franchisees' and Plaintiffs' marks are not only identical, but Franchisees seek to compel Petro to notify customers that Franchisees remain a Petro franchise, and Franchisees are presumably holding them-

5. The test requires a court to "consider the following nonexhaustive list of factors: (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets or purchasers, (5) the identity of the advertising media used, (6) the defendant's interest, and (7) any evidence of actual confusion." *Id.* (citations omitted). Additionally, courts must look to the "degree of care employed by consumers." *Id.*

selves out as a Petro franchise. The Court holds that consumer confusion is likely to be established.

■ The parties' only dispute is whether Franchisees' use of the Petro marks is authorized.[6] *See* Defs.' Resp. 8. Petro has established a high likelihood of showing that the trademark use is unauthorized according to the plain terms of the Agreements and that the use is thus an infringement. The Franchise Agreements specifically state that "Petro must receive all monthly payments required [by the Agreements] by the 25th day of each month[.]" Pls.' Application Ex. 1 at 16. They further provide that if Franchisees "fail[ ] to promptly pay any monies owing to Petro ... when due," "Franchisee[s] shall have 30 days after [their] receipt from Petro of a written Notice of Termination within which to remedy any default [ ] and to provide evidence of cure to Petro." *Id.* at 46. If they do not, the "Agreement[s] shall terminate without further notice to Franchisee[s], effective immediately upon the expiration of the 30 day period...." *Id.* Because they have shown that Franchisees did not pay within thirty days after Petro provided Franchisees a Notice of Termination, Plaintiffs are likely to show that the Agreements were terminated and Franchisees' use of the trademarks is unauthorized.

Franchisees do not dispute that they have not made monthly payments as required by the Agreements. Instead, they argue that their trademark use is authorized unless Plaintiffs have established that the Agreements were properly terminated. The termination was not proper, Franchisees claim, because "Plaintiffs themselves have breached the [ ] Franchisee Agreements." Defs.' Resp. 8. That breach, argue Franchisees, consists of the improper integration of the TA and Petro brands.[7] *Id.*

The Agreements provide that Plaintiffs may not, within Franchisees' exclusive geographic area, "directly or indirectly, establish or grant to any other party a license or franchise to establish" travel centers of a type similar to Franchisees'. Pls.' Application Ex. 1 at 2. If Plaintiffs acquire an existing travel center, that travel center "may not participate in any Petro branded network, fleet, or marketing program made available by Petro to Franchisee[s]." *Id.* at 3. Nor may Plaintiffs "misuse for the benefit of the acquired facility or disclose to any person with responsibility for operation of the acquired facility any confidential business information or marketing plans of or relating to Franchisee[s]." *Id.* Franchisees argue that Plaintiffs' integration of the brands violates these clauses. Defs.' Application at 8–9. In response, Petro argues that Franchisees waived these claims in the Release, and that even if they did not, the Franchise Agreements were nevertheless properly terminated. Pls.' Reply at 6, 10.

Franchisees arguments do not significantly diminish Plaintiffs' likelihood of success on the merits. In order to successfully dispute their unauthorized trademark use, Franchisees would have to establish several propositions. First, Franchisees would have to establish that a franchisor seeking injunctive relief is required to establish proper termination, an issue on

---

**6.** The Franchise Agreements provide that "[a]ny unauthorized use shall constitute an infringement...." Pls.' Application Ex. 1 at 27.

**7.** The Court notes that Franchisees could have sought to enjoin that brand-integration before ceasing payments. *See, e.g., Gerard v. Almouli,* 746 F.2d 936, 939 (2d Cir.1984) ("the preliminary injunction requires [franchisors] not to sell, distribute 'price to or do business with' anyone other than [franchisees] in any of the exclusive distributorship territories").

which courts have disagreed. *Compare S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir.1992) ("[Franchisor] will merit preliminary injunctive relief if it can adduce sufficient facts indicating that its termination of [the] franchises was proper."), *with Burger King Corp. v. Hall*, 770 F.Supp. 633, 638 (S.D.Fla.1991) ("[W]hile a terminated franchisee may seek money damages for any injuries resulting from the alleged wrongful termination of its franchise, it may not continue to use the franchisor's trademarks without authority in violation of law."). The circuit courts which have considered the issue have all held that some form of proper termination is necessary before a franchisor may obtain equitable relief. *See S & R*, 968 F.2d at 375; *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998) (Lanham Act "necessitates some type of showing that the franchisor properly terminated"); *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 430 (7th Cir.2001) (discussing whether franchisor complied with state law requiring notice of default prior to termination); *see generally* Harold R. Bruno, III, *Is Proper Termination Necessary to Obtain a Trademark Injunction?*, 21 FRANCHISE L.J. 204 (2002) (collecting cases). However, this Court is unaware of any Fifth Circuit cases directly addressing this issue.

If Franchisees could show that proper termination was necessary, Franchisees would then have to establish that Plaintiffs' termination was improper. This Court is not aware of a single case where, as here, a franchisee was terminated for non-payment of fees as plainly set forth in a franchise agreement, did not contest its non-payment, and nevertheless established improper termination. *See generally* Howard S. Wolfson, *"One Royalty Strike and You're Out!": A Franchisor's Independent Right to Terminate a Franchise Agreement for Nonpayment of Royalties and the Remedies Available Under the Lanham Act*, 17 FRANCHISE L.J. 1 (1997) (discussing consensus among courts that franchisees may not discontinue payments while seeking to enforce franchise agreements). On the other hand, two circuits have squarely held that "a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor." *Robertson*, 147 F.3d at 1309 (11th Cir.1998) (quoting *S & R*, 968 F.2d at 375). If a franchisor's right to terminate is independent of a franchisee's claims, then Franchisees' claims are irrelevant to the issue of trademark infringement.

The propriety of termination is often at issue when it is based on an ambiguous contract term. *See, e.g., Kerns, Inc. v. Wella Corp.*, 114 F.3d 566, 569 (6th Cir. 1997) (termination for "substantial change in [ ] sales volume"). Alternatively, as in the cases Franchisees cite, a party may contest whether the franchisor actually complied with the termination provisions. *See* Defs.' Resp. 7, 12 (citing *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 806 (9th Cir.1963) (franchisee "claimed that it was not in default"); *Bray v. QFA Royalties LLC*, 486 F.Supp.2d 1237, 1252 (D.Colo.2007) (franchisees "contend they were entitled to actual notice and a meaningful opportunity to cure and that [franchisor] violated the agreement by failing to provide them with either"); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1206–07 (2d Cir.1970) (discussing whether franchisor was required to give franchisee opportunity to cure alleged fraud)). Neither dispute is present here. The termination provisions in the Agreements are not ambiguous, and they were followed to the letter.[8]

8. Franchisees argue that that "Plaintiffs' own actions and inactions demonstrate that they have not in fact terminated the Franchise Agreements." Defs.' Resp. 10. As examples of Plaintiffs' inaction, Franchisees offer Plain-

Franchisees claim that Plaintiffs did not properly terminate the Agreements because they breached their duty of good faith and fair dealing by blending the Petro and TA marks. Defs.' Resp. 8–9. Even if they were to establish that Plaintiffs breached that duty in a way that could affect the propriety of termination, Franchisees would further have to establish that Plaintiffs' particular breach allowed Franchisees to continue operating their Franchises despite failing to pay. This is an unlikely proposition under Texas law. "Where one party materially breaches a contract, the non-breaching party is forced to elect between two courses of action—continuing performance or ceasing performance." Treating a contract as continuing, after a breach, deprives the non-breaching party of any excuse for terminating their own performance. *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887 (Tex.App.1996) (citations omitted); *see also* 17B C.J.S. CONTRACTS § 508 ("[U]nder no circumstances may the nonbreaching party stop his or her performance and continue to take advantage of the contract's benefits."). Moreover, the unlikely success of Franchisees' proposition that two wrongs make a right itself depends on the idea that Plaintiffs' alleged breach of the duty of good faith trumps the plain language of the Franchise Agreements. *See Cook v. Little Caesar Enters.*, 210 F.3d 653, 657 (6th Cir.2000) ("The obligation of good faith cannot be employed, in interpreting a contract, to override express contract terms.") (construing Michigan law). To make matters even

more difficult for Franchisees, all of the above are dependent on Franchisees establishing the threshold proposition that there *is* a duty of good faith and fair dealing in their Agreements. As discussed in the Section of this Order dealing with Franchisees' likelihood of success on the merits, this too is unlikely.

Finally, in order to successfully dispute Plaintiffs' claims, Franchisees would have to show that their arguments are not foreclosed by the Release. The Release refers to "any theories now or hereafter recognized ... relating in any way to" either Franchise Agreement or to Franchisees' counsel's letter. Release 6. In turn, that letter states that "the Petro mark has substantially diminished in value since the acquisition of Petro by TA" and that there is no "distinct separation" between the two brands. Pls.' Reply Ex. C at 2. Franchisees argue that the Release is not relevant because it is "related to the termination of a different franchise[.]" Defs.' Resp. 9. Yet they fail to explain how a Release which specifically provides for payments for the Breezewood and Milton Franchises and release of claims relating to the Breezewood and Milton Franchises does not in fact relate to the Breezewood and Milton Franchises. *See* Release 4, 6.

Franchisees argue that Release does not apply because their breach-of-contract claim arose after the date of the Release. Defs.' Reply 1. The plain language of the Release provides an exception only for "claims *first* arising *solely* after the date of

tiffs' inclusion of the Breezewood and Milton Franchises on their website as of the date of their Application and Plaintiffs' refusal to "enter the franchise premises for the purpose of removing or covering their protected marks following termination of the Agreements." Defs.' Resp. 10. Neither of these arguments are relevant. Plaintiffs have no duty to assist Franchisees in their post-termination obligations, *see* Pls.' Application Ex. A at 10, and

their failure to do so does not affect the propriety of the termination. Nor do Franchisees suggest that Plaintiffs consented to the unauthorized trademark use. *Cf. Baskin–Robbins Inc. v. Douglass*, No. 98 Civ. 5783(LMM), 1999 WL 528194, at *3 (S.D.N.Y. July 28, 1999) (preliminary injunction denied when franchisor's counsel sent letter to franchisee consenting to use of franchisor's marks pending trial).

this [Release]." *Id.* at 7 (emphasis added). Franchisees would be fighting logic in trying to show that their claims, which are concededly based on the integration of the TA and Petro brands, arose for the first time after the date of the Release and are not based even in part on events occurring before the date of the Release. "Under the legal-injury rule, a cause of action generally accrues when a wrongful act causes some legal injury ... *even if all resulting damages have not yet occurred."* *Seureau v. ExxonMobil Corp.,* 274 S.W.3d 206, 226 (Tex.App.2008) (emphasis added). If the alleged wrongful act is the brand-integration referenced in Franchisees' counsel's letter, it began before the date of the Release. In fact, Franchisees do not point to any discrete action Plaintiffs took after the date of the Release which further integrated the brands.

In sum, Plaintiffs have clearly established a substantial likelihood of success on the merits. They have complied with the specific termination provisions of the Franchise Agreements. According to the Agreements' plain language, the Agreements have terminated. Franchisees' use of Plaintiffs' registered marks meets all other elements of a trademark violation. Finally, while Franchisees may seek to establish that their use is authorized, Plaintiffs are nevertheless likely to prevail.

### b. Franchisees

■ Franchisees seek a preliminary injunction on the basis of claims for breach of contract and breach of the duty of good faith and fair dealing.[9] Franchisees allege that Plaintiffs' breached the Franchise Agreement by integrating the TA and Petro brands within Franchisees' exclusive area. Countercl. 9. Franchisees have not

established a substantial likelihood of success on the merits.

First, Franchisees would again be required to show that their breach-of-contract claim has not been foreclosed by the Release. To do so, they would have to show that it is a claim which first arose solely after the date of the Release. For the reasons stated above, Franchisees are unlikely to do so. Even if they distinguish the language of the Release from their breach-of-contract claim, Franchisees would have to show a breach of the contract. The parties dispute whether the Petro and TA marks were blended. Franchisees' claims are based on "information and belief" as set forth in the Declaration of Defendant All American Plazas, Inc.'s president. Defs.' Application 5; *see also* Defs.' Decl. Relying on Petro's director of franchising, Plaintiffs counter that "factually [Franchisees'] claims are not true." Pls.' Resp. 14; *see also* Pls.' Decl. Because Franchisees have to both establish the truth of their factual claims and, more importantly, show that those claims were not foreclosed by their Release, Franchisees' likelihood of success on the merits on their breach-of-contract claim is not substantial.

■ Nor have Franchisees established a likelihood of success on the merits of their claim for breach of the duty of good faith and fair dealing. Under Texas law, a duty of good faith and fair dealing is not automatically present in a franchise relationship. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 225–26 (Tex.2002) (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992)). Acknowledging this, Franchisees argue that even if Texas law does not provide for

---

9. Franchisees' non-payment of fees did not necessarily deprive Franchisees of a cause of action for breach of contract. *See Chilton*

*Ins.,* 930 S.W.2d at 877 (citing *Western Irrigation Co. v. Reeves County Land Co.,* 233 S.W.2d 599, 602 (Tex.Civ.App.1950)).

duty of good faith and fair dealing, their Agreements do. *See* Defs.' Reply 3. Specifically, Franchisees point to the section of the Agreements dealing with confidential information, which includes a sentence stating that "[t]he parties expressly understand and agree that the relationship established between the [parties] by this Agreement is one of confidence and trust." Pls.' Application Ex. 1 at 28. Franchisees argue that this language gives rise to a duty of good faith and fair dealing. Defs.' Reply 3.

Though a duty of good faith and fair dealing may indeed be written into a contract, *Crim Truck,* 823 S.W.2d at 595–96, Franchisees are unlikely to show that such a duty was written into theirs. Franchisees state that a "relationship of 'trust and confidence' . . . gives rise to a duty of good faith and fair dealing." Defs.' Reply 3 (quoting *Bradley v. Phillips Petroleum Co.,* 527 F.Supp.2d 661, 686–87 (S.D.Tex. 2007) (quoting *Lovell v. Western Nat'l Life Ins. Co.,* 754 S.W.2d 298, 302 (Tex.App. 1988)). However, *Bradley*—and the Texas case which it quotes—states that a duty of good faith and fair dealing "does not exist in Texas [1] unless intentionally created by express language in a contract or [2] unless a special relationship of trust and confidence exists between the parties in the contract." *Bradley,* 527 F.Supp.2d at 686–87 (quoting *Lovell,* 754 S.W.2d at 302 (Tex.App.1988)).

■ As stated in *Bradley,* a duty of good faith and fair dealing may be implied from a relationship of trust and confidence when there is no express language providing for that duty. It does not necessarily follow that the express language should provide for "a relationship of trust and confidence," as the Agreements did, rather than the more logical "duty of good faith and fair dealing." In a case with similar facts, the Texas Supreme Court held that a clause in a franchise agreement providing for "a personal agreement, involving mutual *confidence and trust*" was "not intended to inject an element of personal trust and confidence above and beyond that which is ordinarily contemplated by parties to contracts of this type." *Crim Truck,* 823 S.W.2d at 595–96 & n. 7 (emphasis added). In *Crim Truck,* that clause was written into the portion of the contract relating to assignment. *Id.* at 596 ("such 'boiler plate' language is designed to give the parties some degree of control over with whom they do business, and nothing more"). Here, it was written in the portion providing for non-disclosure of confidential information. To prevail on the merits, Franchisees would have to distinguish their Agreements from the agreement in *Crim Truck.* And again, for the reasons stated above, Franchisees would also have to show that their good faith and fair dealing claim is outside of the Release. Because Franchisees' claims are unlikely to succeed both due to the language of the Agreements and the language of the parties' Release, Franchisees have not established a substantial likelihood of success on the merits.

## C. Irreparable Harm

### a. Plaintiffs

Having established a likelihood of success on the merits, Plaintiffs must also establish a substantial threat of irreparable harm if an injunction is not issued. Plaintiffs claim that they are threatened with irreparable harm due to a loss of control over their trademarks. Pls. Application 16–17. Franchisees argue that because Plaintiffs have made no showing of a specific threat of irreparable harm, such harm cannot be presumed and has not been established. Defs.' Resp. 11.

The Fifth Circuit has left open the question "whether a court may presume irreparable injury upon finding a likelihood of

confusion in a trademark case[.]" *Paulsson,* 529 F.3d at 312–13. In *Paulsson,* the Fifth Circuit first noted that the First, Second, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits have all endorsed that presumption. *Id* at 312. However, it also cited to an Eleventh Circuit case which questioned whether this presumption may be precluded by the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). *Paulsson,* 529 F.3d at 312 (citing *N. Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1227–28 (11th Cir.2008); *eBay,* 547 U.S. at 393–94, 126 S.Ct. 1837). In *eBay,* the Supreme Court "reversed the Federal Circuit for applying a categorical rule to permanent injunctions in a Patent Act case." *Paulsson,* 529 F.3d at 312 (citing *eBay,* 547 U.S. at 393–94, 126 S.Ct. 1837).

▇▇▇ The Court holds that Plaintiffs have established irreparable harm whether that harm is presumed or must be established. First, *eBay* does not necessarily foreclose a presumption of harm; it "hold[s] only . . . that [equitable] discretion must be exercised consistent with traditional principles of equity." *eBay,* 547 U.S. at 394, 126 S.Ct. 1837. Specifically, the Supreme Court precluded "a rule that an *injunction automatically follows* a determination that a copyright has been infringed," *eBay,* 547 U.S. at 393–94, 126 S.Ct. 1837 (emphasis added) (citations omitted). A conclusive determination that three equitable factors automatically follow when

success on the merits is established is quite far from a mere presumption that a single factor—irreparable harm—should usually follow when likelihood of confusion is established. *See* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:47 (4th ed.2009) ("the presumption of irreparable injury traditionally followed in trademark preliminary injunction cases is in [no] way inconsistent with the letter or the spirit of the Supreme Court's *eBay* decision").[10] If a presumption of irreparable harm exists upon a finding of likelihood of confusion, Franchisees have not offered any evidence to rebut it.

Even if irreparable harm is not presumed, it may easily be found in this case. *Paulsson* upheld the district court's grant of a preliminary injunction when the district court found that

> [t]here is a likelihood of harm to [plaintiff] in the case of defendants' further use of the marks because of the *possible injury* to the company's goodwill should [defendants' contract not be satisfactorily performed], or should the [ ] marketplace believe that [plaintiff] is sponsoring [defendants' services] *in the event that* inferior or inappropriate technology and services are used instead.

*Paulsson,* 529 F.3d at 313 (emphasis added).

The Fifth Circuit also stated that the plaintiff's valuable business and the small community of potential customers are rele-

---

**10.** Notably, *eBay* concerned the Federal Circuit's "general rule that courts will issue *permanent* injunctions against patent infringement absent exceptional circumstances." *eBay,* 547 U.S. at 391, 126 S.Ct. 1837 (internal quotation omitted) (emphasis added). By contrast, the Federal Circuit has long held that "[t]he standards applied to the grant of a preliminary injunction are no more nor less stringent in patent cases than in other areas of the law." *H.H. Robertson, Co. v. United*

*Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir. 1987), *abrogated on other grounds by Markman v. Westview Instruments, Inc..,* 52 F.3d 967 (Fed.Cir.1995); *see also Capital Tool and Mfg. Co., Inc. v. Maschinenfabrik Herkules,* 837 F.2d 171, 172–73 (4th Cir.1988) (categorically allowing permanent injunctions upon showing of violation of Virginia Uniform Trade Secrets Act but holding that irreparable harm is a prerequisite for preliminary injunctive relief).

vant factors in determining the possibility of injury. *Id.* These factors apply to Plaintiffs in this case with the equal force. "There are twenty-four franchised Petro locations throughout the United States." Pls. Application 5. Moreover, Franchisees themselves claim that "more than half of the business generated at [their] locations results from [fleet operators'] participation in the various program offered as part of the Petro Franchise System." Defs.' Application 8.

Plaintiffs have also established irreparable harm due to the parties' relationship. The *Paulsson* court approved a preliminary injunction because of the potential harm which would occur "should the marketplace believe" that the plaintiff was sponsoring the defendant's business. *Paulsson,* 529 F.3d at 313. In this case, that belief is almost certain. Franchisees hold themselves out as Petro franchises, and promote and reinforce customers' beliefs that they are licensed by Petro. For example, if Franchisees fail to provide the quality of service customers expect, customers will almost certainly attribute the poor service to Plaintiffs and could be discouraged from returning to other Petro franchises in the future. *See Country Inns & Suites by Carlson, Inc. v. Nayan LLC,* No. 1:08–CV–624–SEB–DML, 2008 WL 4735267, at *6 (S.D.Ind. Oct.28, 2008); *see also Paulsson,* 529 F.3d at 313 (irreparable harm threatened "in the event that inferior or inappropriate ... services are used instead").

Alternatively, if Franchisees provide services different from Plaintiffs', even if those services are superior, "[t]he result ... is a collision between [ ] goodwills; and the ... rightful owner [suffers] a risk of injury to reputation." 3 LOUIS ALTMAN AND MALLA POLLACK, CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 20:20 (4th ed.2008). In any event, if the Franchisees' services are different in any

way, the common denominator is Plaintiffs' loss of control over their goodwill. However that loss may manifest itself, it constitutes a substantial threat of irreparable harm. Given the size and nature of Plaintiffs' business and the confusion which Franchisees would foster by holding themselves out as an authorized franchise if they are not, Plaintiffs have shown a "substantial threat to [their] goodwill ... [that] cannot be undone by monetary remedies." *Paulsson,* 529 F.3d at 313.

In determining the scope of the injunction, however, the Court notes that Plaintiffs' argument is confined to the harm that they would suffer if Franchisees operate Petro-branded travel centers. *See* Pls.' Resp. 17. Plaintiffs do not claim a threat of harm if Franchisees operate non-Petro-branded travel centers. In fact, Plaintiffs note that Franchisees now operate, and may continue to operate, approximately ten to twelve non-Petro-branded travel centers. *Id.* at 17 & n. 4 ("Even though the Franchise Agreements have been terminated, [Franchisees] may still operate travel centers"). At the same time, Plaintiffs request that Franchisees "otherwise comply with the post termination provisions of the Breezewood and Milton Franchise Agreements." Pls.' Application 20. Those Agreements' non-competition provisions prohibit Franchisees from operating *any* travel centers within 100 miles of a Petro-branded travel center. *See id.* Ex. 1 at 4–5, 51–52. Given the discrepancy between Plaintiffs' Response and their earlier-filed Application, the Court will assume that Plaintiffs have disclaimed their request that it preliminarily enjoin Franchisees from operating non-Petro-branded travel centers near Petro-branded travel centers. If Plaintiffs have not in fact disclaimed that request, they have alternatively failed to establish irreparable harm as to that portion of their Application.

### b. Franchisees

■ Franchisees argue that the loss of their franchise would constitute irreparable harm. Defs.' Application 10–11. Assuming arguendo that Franchisees are likely to succeed on the merits—which, as explained above, they are not—their argument is nevertheless unavailing. Notably, a temporary loss of the Franchises may be calculated and remedied with money damages. For Franchisees' harm to be irreparable, they must plausibly show that they cannot be compensated, e.g., that they will go out of business pending trial. *See Bray*, 486 F.Supp.2d at 1239 (enjoining termination where "there is ample evidence in the record regarding the likelihood that the immediate terminations ordered by [franchisors] would effectively close [franchisees] stores completely pending trial"); *Gilchrist Mach. Co., Inc. v. Komatsu Am. Corp.*, 601 F.Supp. 1192, 1203 (S.D.Miss.1984) (permitting termination where "[t]he court is not convinced ... that termination of the franchise will force [franchisee] to close its doors").

Franchisees have failed to make a showing of irreparable harm. Their Application states, in conclusory fashion, that "it is likely that neither [Franchisee] will be able to continue as a going concern." Defs.' Application 11.[11] This does not suffice. In fact, Franchisees had previously reneged on the opportunity to run one of their travel centers under the Petro brand, and had expressed no fear for their ability to continue as a going concern. *See* Pls.' Reply Ex. C at 1. Insofar as Franchisees' viability is threatened by the non-competition provisions of the Agreements, as stated above, those provisions will not be in-corporated into the preliminary injunction. *See* Pls.' Resp. 17.

Further, even if Franchisees were to show that they will go out of business, the Court will not assume that the value of their business is incalculable. "Particularly for franchisees, the expectation interest in a franchise agreement is the value of the business itself. This can be measured in several ways[.]" 2 W. MICHAEL GARNER, FRANCHISE DISTRIBUTION LAW AND PRACTICE, § 8:64 (2008). Admittedly, the full value of a franchise is not in all cases equal to its monetary value. In *Semmes Motors*, a leading case on the issue of irreparable harm from franchise termination, Judge Friendly described the franchisee's predicament thusly: "[Franchisee] want[s] to sell automobiles, not to live on the income from a damage award." *Semmes Motors*, 429 F.2d at 1205. Here, Franchisees are not in that predicament. They may want to run travel centers, but they do not dispute Plaintiffs' contention that they currently run ten to twelve other travel centers not associated with Petro, and they demonstrate no particular sentimental attachment to the Petro brand. In such a plainly and purely commercial situation, Franchisees are especially poorly placed to argue that they would not be made whole by a damages award. *See* Peter Linzer, *On the Amorality of Contract Remedies— Efficiency, Equity, and the Second Restatement*, 81 COLUM. L.REV. 111, 115–16 (1981) ("People generally enter into commercial contracts ... for purely economic reasons and can therefore be fully compensated with damages for injuries caused by breach.").

11. Given that Franchisees have not made a strong showing of success on the merits, this prediction will likely be tested regardless of how the Court rules on either Application. *See ABA Distrib., Inc. v. Adolph Coors Co.*, 661 F.2d 712, 714 (8th Cir.1981) (where district court granted preliminary injunctive relief to movant who made no showing of success on the merits, it "accorded undue weight to a harm that [movant] may well eventually suffer despite the grant of preliminary relief").

### D. Balance of Harms

#### a. Plaintiffs

Plaintiffs must establish that their threatened injury outweighs any damage that the injunction might cause Franchisees. Plaintiffs easily satisfy this factor. The Court has determined that Plaintiffs' threatened harm is irreparable, while the potential harm to Franchisees is determinable and compensable. Accordingly, Plaintiffs' irreparable injury outweighs Franchisees' reparable injury.

#### b. Franchisees

If a party is enjoined from using a trademark, "it is inevitable that [it] will suffer some hardships...." *Appleseed Found. v. Appleseed Inst.*, 981 F.Supp. 672, 678 (D.D.C.1997). Nevertheless, for the same reasons that Plaintiffs have established that the balance-of-harms favors granting their Application, Franchisees have failed to so establish. Additionally, the Court notes that the harm which Franchisees allege is at least partially self-inflicted. By failing to perform under the Agreements and seeking to enjoy the benefits of those Agreements, Franchisees "brought [the] difficulties occasioned by the issuance of an injunction upon [themselves]." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir.1990) (citations omitted).

### E. Public Interest

#### a. Plaintiffs

Plaintiffs must show that the injunction does not disserve the public interest. Plaintiffs argue that "[t]he public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." Pls.' Application 18 (quoting *Quantum Fitness Corp. v. Quantum Lifestyle Cent., L.L.C.*, 83 F.Supp.2d 810, 832 (S.D.Tex.1999)). Stated more narrowly, the Court agrees that because there is a high probability of success on the merits of a trademark claim, the public interest is not disserved by an injunction prohibiting Franchisees from using Plaintiffs' marks.

#### b. Franchisees

Franchisees argue that "preservation of competition between Plaintiffs and [Franchisees'] travel plazas is plainly in the public interest." Defs.' Application 11. To the extent that this is true, it cuts against Franchisees' argument. Franchisees seek to preserve the Franchise Agreements, and in fact argue that there is a duty of good faith and fair dealing embedded in those Agreements. Based on the relief they seek, Franchisees do not wish to view the parties as competitors; it is Plaintiffs who seek to sever the parties' relationship and allow for competition.

In fact, the confusion inherent in Franchisees' view of the parties' relationship as both franchisor-franchisees and competitors reveals another reason why the public interest is served by granting Plaintiffs' Application. Plaintiffs have told some customers that Franchisees are not a Petro franchise; Franchisees seek to inform those same customers that they are a Petro franchise; to dispel the resulting confusion would serve the public interest. *See Bell v. StreetWise Records*, 761 F.2d 67, 76 (1st Cir.1985) (Breyer, J. and Coffin, J., concurring) ("[T]he court ... left both plaintiffs and defendant free to use the trade name. Even if this result were fair as between the parties, it is not fair in respect to the public.").

### F. Status Quo

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 398, 101 S.Ct.

1830, 68 L.Ed.2d 175 (1981). Franchisees argue that granting Plaintiffs' Application would improperly alter the status quo pending a trial on the merits. Defs.' Resp. 6. Franchisees reason that because they had been using those marks before the lawsuit was commenced, the parties' position would be altered if they were enjoined from doing so pending a trial. Defs.' Resp. 6. This argument begs the question. The parties' relative position is either 1) franchisor and franchisee legally operating pursuant to improperly-terminated Franchise Agreements or 2) franchisor and former franchisee illegally operating pursuant to properly-terminated Franchise Agreements. If the Agreements were not properly terminated, the parties' positions are preserved by continuing the franchise relationship. If the Agreements were properly terminated, the parties' positions are preserved by ensuring that the franchise relationship is fully discontinued. Either way, the fact that Franchisees used Plaintiffs' proprietary marks before Plaintiffs filed their Complaint without reference to whether that use was proper does nothing to illuminate the parties relative positions.

If Franchisees' argument about how to arrive at the parties' relative positions were correct, preliminary injunctions would not be possible under the Lanham Act. Any party which seeks to preliminarily enjoin trademark use by definition does so because that use is ongoing. If the fact that the use is ongoing were to prevent the granting of a preliminary injunction, the trademark-holder would be finished before they could begin. Such is plainly not the case, as preliminary injunctions are routinely granted to prevent ongoing use of a trademark. *See, e.g., Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1114, 1122 (7th Cir.1997) (reversing district court's denial of preliminary injunction prohibiting use of plaintiff's business name); *Dunkin' Donuts Franchised Rests. LLC v. Shrijee Inv., Inc.,* No. 08–

12836, 2008 WL 5384077, *2, *13, 2008 U.S. Dist. LEXIS 107353, at *6, *39 (E.D.Mich. Dec.23, 2008) (granting preliminary injunction to franchisor when franchisee failed to pay franchise fees). Further, if the Court were to accept Franchisees' argument, it would be forced to categorically deny injunctions for ongoing trademark violations, a result which *eBay* clearly prohibits. *See eBay,* 547 U.S. at 394, 126 S.Ct. 1837 ("Just as the District Court erred in its categorical denial of injunctive relief, the Court of Appeals erred in its categorical grant of such relief.")

In fact, Franchisees' argument about the status quo is more properly presented in the context of irreparable harm. "The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Exhibitors Poster Exch.,* 441 F.2d at 561 (emphasis added); *see also United States v. Or. Med. Soc'y,* 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952) ("[t]he sole function of an action for injunction is to forestall future violations") (emphasis added). Because Franchisees have not established that they face irreparable harm, the status quo would not be altered by granting Plaintiffs' Application.

## G. Unclean Hands

Franchisees argue that "Plaintiffs are not entitled to injunctive relief [because] they are guilty of inequitable conduct or 'unclean hands[.]' " Defs.' Resp. 10 (quoting *Sugar Busters LLC v. Brennan,* 177 F.3d 258, 272 (5th Cir.1999) (citing *Levi Strauss & Co. v. Shilon,* 121 F.3d 1309) (1997)). As the basis of their unclean-hands defense, Franchisees incorporate by reference their allegation that Petro integrated the Petro and TA brands so as to deprive Franchisees of the benefits of the

Franchise Agreements. *See id.* ("As detailed above, Plaintiffs' [sic] have breached [the parties'] relationship in a variety of ways . . . .").

■ Unclean hands is a historic equitable doctrine which operates to guide a court's discretion in granting equitable relief. *See eBay,* 547 U.S. at 394, 126 S.Ct. 1837 ("[when making] the decision whether to grant or deny injunctive relief . . . discretion must be exercised consistent with traditional principles of equity"); *see also Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S. 240, 244, 54 S.Ct. 146, 78 L.Ed. 293 (1933) ("It is one of the fundamental principles upon which equity jurisprudence is founded, that [a complainant] must come into court with clean hands."). The doctrine applies "when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 174 (3d Cir.2001) (citing *Keystone Driller,* 290 U.S. at 244, 54 S.Ct. 146); *accord Dahl v. Pinter,* 787 F.2d 985, 988 (5th Cir.1986), *vacated on other grounds,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *see also Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir.1979) ("The maxim of unclean hands is not applied where [the] plaintiff's misconduct is not directly related to the merits of the controversy between the parties"). The Fifth Circuit has specifically endorsed unclean hands as a defense to a trademark infringement suit. *See Sugar Busters,* 177 F.3d at 272 (1999) (citing, inter alia, *Shilon,* 121 F.3d at 1313 (9th Cir.1997)).

■ The unclean hands doctrine requires a finding of both inequitable conduct and a finding that the conduct relates to the requested relief. *See* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2946 (2d ed.1995). The precise meaning of "inequitable conduct"—itself a circular proposition—has not been stated identically in every case. *Compare Mitchell Bros. Film Group,* 604 F.2d at 863 ("wrongful acts"), *with Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 150 (5th Cir.1985) ("explicit bad faith intent"), *with Dahl,* 787 F.2d at 988 ("unconscionable [acts]"), *with Shilon,* 121 F.3d at 1313 ("fraud or deceit") (quotation omitted). Franchisees claim Plaintiffs engaged in a variety of intentional conduct designed to reduce the standalone value of the Petro brand. *See, e.g.,* Defs.' Resp. 5 (alleging that Plaintiffs "purposefully" blended rewards program to make professional truck drivers believe "Petro and TA were one and the same"). Franchisees do not suggest that such conduct is shocking the conscience, but that the alleged conduct is both inequitable and intentional.

Nevertheless, Franchisees do not establish the necessary relation between the conduct and the injunction which Plaintiffs seek. That relation has also been stated in various ways. At the minimum, Plaintiffs' conduct must have injured Franchisees. *See Positive Black Talk Inc. v. Cash Money Records Inc.,* 394 F.3d 357, 379 (5th Cir.2004) (denying unclean hands defense for lack of injury without discussing other factors). Franchisees meet this minimum, contending that Plaintiffs' conduct "substantially reduced" their sales. Defs.' Resp. 5. This is not enough.

In its historical formulation, the unclean hands doctrine may preclude equitable relief only when the wrongful act "has *immediate and necessary relation* to the equity that [the plaintiff] seeks . . . ." *Keystone Driller,* 290 U.S. at 244, 54 S.Ct. 146 (citing W.H. LYONS, JR., STORY'S EQUITY JURISPRUDENCE § 98 (14th ed.1918); 1 JOHN NORTON POMEROY, JR., EQUITY JURISPRUDENCE, § 397 (4th ed.1918)) (emphasis added)); *accord Fickett–Brown,* 140 F.2d at 884; *Dahl,* 787 F.2d at 988. The Fifth Circuit

has stated that the conduct must be "directly related," *Mitchell Bros. Film Group*, 604 F.2d at 863, or "immediately related," to the plaintiff's claim. *Dahl*, 787 F.2d at 988. Most recently, the Fifth Circuit cited to *Shilon* for the proposition that the unclean-hands defense applies to Lanham Act cases when the inequitable conduct relates to the claim. *Sugar Busters*, 177 F.3d at 272. *Shilon* in turn required that the plaintiff "have acted fairly and without fraud as to the controversy in question." *Shilon*, 121 F.3d at 1309 (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir.1987). Under any formulation, a court applies the unclean-hands doctrine because "[t]o aid a party [who has acted inequitably] would make th[e] court the abetter of iniquity." *Keystone Driller*, 290 U.S. at 244, 54 S.Ct. 146 (quoting *Bein v. Heath*, 47 U.S. 228, 247, 6 How. 228, 12 L.Ed. 416 (1848)). On the other hand, the doctrine "should not be used as a loose cannon, depriving [a] plaintiff of an equitable remedy ... merely because he is guilty of unrelated misconduct." *Healthpoint, Ltd. v. Ethex Corp.*, 273 F.Supp.2d 817, 848 (W.D.Tex.2001) (quoting *American Hosp. Supply Corp. v. Hospital Prod. Ltd.*, 780 F.2d 589, 601 (7th Cir.1986)). It "does not purport to search out or deal with the general moral attributes ... of a litigant." *Mitchell Bros. Film Group*, 604 F.2d at 863 (quoting *NLRB v. Fickett–Brown Mfg. Co.*, 140 F.2d 883, 884 (5th Cir.1944)).

▮ Plaintiffs' alleged misconduct relates to Plaintiffs' trademark infringement claim only insofar as they both stem from the Franchise Agreement. The relationship is not immediate, necessary, or direct; nor does it relate to the controversy in question. Plaintiffs' trademark infringement claim is based on their termination of the Franchise Agreements; that termination is in turn based on Franchisees' default for failure to pay any franchise fees. For the alleged wrongful acts to have the requisite relationship to this chain of events, Franchisees must show that Plaintiffs' actions relate to Franchisees' failure to pay. Franchisees do not do so. In their Response, Franchisees include a statement by Defendant All American Plaza, Inc.'s president stating that their sales have been "substantially reduced." Defs.' Decl. 10, 11.[12] This likely affected Franchisees' desire to pay; it does not show that it affected their ability to pay.[13] Because they failed to show more than a conjectural relationship between the misconduct and the termination, Franchisees have not established Plaintiffs' unclean hands.[14] Plaintiffs otherwise

**12.** Franchisees later state that "[Plaintiffs'] breach of the [F]ranchise [A]greements placed [Franchisees] in the position of being unable to pay [the franchise] fees." Defs.' Reply 1. While their earlier claim of a reduction in sales is supported by an affidavit, the later statement is embedded in a legal argument and is unsupported by *any* evidence. "Allegations in pleadings are not evidence...." *In re Grand Jury Subpoena*, 419 F.3d 329, 336 (5th Cir.2005).

**13.** Franchisees' claim that they are unable to pay is curious in light of the fact that Franchisees provided the Court with an email from their attorney, dated July 22, 2008, which states that franchisees "will wire to Petro tomorrow morning the sum of $72,172,89,"

and would do so "[i]n the spirit of their desire to resolve [their] issues." Defs.' Application Ex. B at 2.

**14.** In Response to an Order ordering the parties to show cause why an oral hearing is necessary in this case, Franchisees responded that "whether [Plaintiffs'] conduct ... caused [Franchisees] to be unable to pay [their] franchise fees" is a matter of factual dispute. Defs.'/Counter–Pls.' Resp. to Show Cause Order (Doc. No. 37) at 1. The Court then concluded that a hearing is not necessary. Order, Mar. 3, 2009 (Doc. No. 38). *"[W]here factual disputes are presented*, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction

meet the requirements for equitable relief, and granting that relief would not make the court the abetter of iniquity.

## H. Conclusion—Preliminary Relief

Plaintiffs have established a strong likelihood of success on the merits of their trademark claim, and Franchisees' defenses are insufficient to diminish that likelihood. Plaintiffs have shown irreparable harm from the loss of control over their marks and their requested relief would not disserve the public interest. Additionally, Plaintiffs have disclaimed their request to enforce the non-competition covenant in the Franchise Agreements through a preliminary injunction, or in the alternative have failed to show that they will suffer irreparable harm if that covenant is not enforced. Because a preliminary injunction would not alter the status quo and Plaintiffs do not have unclean hands, the Court will issue a preliminary injunction against Franchisees' continued use of Plaintiffs' proprietary marks pending the outcome of this case.

Franchisees have not established a strong likelihood of success on the merits and have not shown that any harm they will suffer cannot be compensated with money damages. Further, the balance of harms militates in Plaintiffs' favor. Accordingly, Franchisees have not shown why their requested preliminary injunction should be issued.

## I. Security Amount

██ Rule 65 of the Federal Rules of Civil Procedure provides that the movant for a preliminary injunction must "give[ ]

security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). District courts have discretion over the amount of the security, though it is unclear whether they have discretion not to require the posting of security at all. Compare *Kaepa* 76 F.3d at 627 (quoting *Corrigan Dispatch Co. v. Casa Guzman,* 569 F.2d 300, 303 (5th Cir. 1978) ("the court 'may elect to require no security at all')"), with *Phillips v. Chas. Schreiner Bank,* 894 F.2d 127, 131 (5th Cir.1990) (quoting *Continuum Co. v. Incepts, Inc.,* 873 F.2d 801, 803 (5th Cir.1989) ("failure to require the posting of a bond or other security constitutes grounds for reversal)"). Plaintiffs state that they "are willing to post a bond in the amount the court deems appropriate...." Pls. Application 19. Franchisees, in turn, do not mention the bond requirement, stating only that granting Plaintiffs' Application would "put [Franchisees] out of business." Defs. Resp. 6.[15]

██ Several considerations compel this Court to conclude that a relatively low bond amount is appropriate. First, because Plaintiffs' likelihood of success on the merits is strong, this Court elects to resolve uncertainties as to the proper basis for calculation in their favor. See *Shrijee,* 2008 WL 5384077, *9, 2008 U.S. Dist. LEXIS 107353, at *29 ("the strength of [franchisor's] likelihood of success on the merits obviates any need for a bond"). Second, Franchisees have failed to provide this Court with so much as a suggestion of

---

may be granted." *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 627 (5th Cir.1996) (emphasis added) (quotation omitted); *see also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 552–53 (6th Cir.2007). Franchisees' have presented no facts showing their inability to pay which Plaintiffs could dispute.

15. It is unclear whether Franchisees believe that they would be forced out of business if the non-competition covenant in their Agreements is not part of the preliminary injunction.

the numerical loss they could suffer from the issuance of a preliminary injunction, despite the fact that Plaintiffs expressed their willingness to post an appropriate bond in their initial Application. Finally, Franchisees themselves state that "the value and distinctiveness of the Petro brand" has "diminished." Defs.' Application 6. Franchisees may run their travel centers under a different brand—as they already do in other locations—and the Court will not assume, absent evidence, that doing so would significantly diminish their profits. Taking into account the costs of removing Plaintiffs' marks from their travel centers and otherwise complying with the post-termination provisions of the Franchise Agreements, as well as the costs of ceasing to operate their travel centers as Petro franchises, the Court concludes that a bond in the amount of $25,000 is appropriate.

## III. CONCLUSION

For the reasons set forth herein, Plaintiffs' Application for Preliminary Injunction Against Defendants All American Properties, Inc. and All American Plazas, Inc. **(Doc. No. 15)** is hereby **GRANTED** in part, subject to the following provisions:

1. Defendants All American Plazas, Inc., and All–American Properties, Inc., their officers, directors, agents, employees, subsidiaries, affiliates, assigns, licensees, and anyone acting in concert with them are hereby **ENJOINED** from:

   a. Using any trademarks owned and/or licensed by Plaintiff Petro Franchise Systems LLC or Plaintiff TA Operating LLC, or any marks confusingly similar thereto;

   b. Otherwise infringing on Plaintiff Petro Franchise Systems LLC's or Plaintiff TA Operating LLC's trademarks;

   c. Otherwise diluting Plaintiff Petro Franchise Systems LLC's or Plaintiff TA Operating LLC's trademarks;

   d. Otherwise unfairly competing with Plaintiff Petro Franchise Systems LLC or Plaintiff TA Operating LLC.

2. Defendants All American Plazas, Inc., and All–American Properties, Inc. are hereby **ORDERED** to immediately de-identify their travel centers from the Petro Franchise System and otherwise comply with the post-termination provisions of the Breezewood Franchise Agreement and the Milton Franchise Agreement.

   a. This Order **does not apply** to the Covenant Not to Compete set forth in Section 1.7 of the Breezewood Franchise Agreement and Section 1.7 the Milton Franchise Agreement.

3. Defendants All American Plazas, Inc. and All American Properties, Inc. are hereby **ORDERED** to deliver to Plaintiff Petro Franchise Systems LLC or Plaintiff TA Operating LLC all brochures, manuals, software, marketing and promotional materials, and signage of any kind bearing any trademarks owned and/or licensed by Plaintiff Petro Franchise Systems LLC or Plaintiff TA Operating LLC.

4. Within **thirty days** after the date this Order takes effect, Defendants All American Plazas, Inc., and All–American Properties, Inc. are hereby **ORDERED** to report to this Court, setting forth the manner and form in which Defendants All American Plazas, Inc., and All–American Properties, Inc. complied with this Order.

5. This Order shall take effect upon Plaintiffs' posting of a bond, in the total amount of $25,000.00, by no later than **April 6, 2009,** and pursuant to applicable Local Rules of the Western

District of Texas. *See* W.D. Tex. Loc. R. CV–67.

Defendants' Application for a Temporary Restraining Order and Preliminary Injunction (**Doc. No. 25**) is hereby **DENIED**

**SO ORDERED.**